[No. B187743. Second Dist., Div. One. Mar. 14, 2007.]

SAFECO INSURANCE COMPANY OF AMERICA, Plaintiff and Appellant,
v.
FIREMAN'S FUND INSURANCE COMPANY, Defendant and Respondent.

## COUNSEL

Demler, Armstrong & Rowland, Raymond H. Goettsch and James P. Lemieux for Plaintiff and Appellant.

Horvitz & Levy, Mitchell C. Tilner, Karen M. Bray; Caron, Constants & Wilson and Sherry L. Pantages for Defendant and Respondent.

## OPINION

**MALLANO, Acting P. J.**—In a prior action, an insured homeowner was found liable to a downhill neighbor for a landslide that inundated the neighbor's backyard with dirt and debris. The judgment totaled around $4 million. The homeowner's primary and excess insurers provided a defense and indemnity. This is a declaratory relief action between the insurers concerning the coverage provided under successive policies issued by the primary insurer.

Immediately after the landslide, the City of Los Angeles determined that the neighbor's backyard was unusable and ordered the insured to repair the slope. But the slope went unrepaired for years, and the backyard remained unusable while each of the primary policies was in effect.

The primary insurer issued four successive policies that covered an "occurrence [of] property damage," defined as an accident, including continuous exposure to the same conditions resulting in a loss of use during the policy period. The policies separately covered an "occurrence [of] personal injury,"

which included "an act . . . that occurs during the policy period and which results [in wrongful entry or eviction]." Each policy had limits of $500,000 per occurrence.

■ In this case, the primary insurer contended it was liable for only one occurrence, or $500,000. The excess insurer argued that because both property damage and personal injury occurred in all four policy periods, the primary insurer was liable for up to $4 million. The trial court granted summary judgment for the primary insurer, stating that coverage under the primary policies was limited to $500,000. We agree. There was only one occurrence because the ensuing damage was the result of one cause: the landslide. Further, under the policy language, the continuation of any damage into subsequent policy periods—for example, loss of use—did not give rise to multiple occurrences. The judgment is accordingly affirmed.

# I

## BACKGROUND

The parties stipulated to the material facts. We also accept as true the additional undisputed facts supported by the cross-motions for summary judgment. (See *Raghavan v. Boeing Co.* (2005) 133 Cal.App.4th 1120, 1125 [35 Cal.Rptr.3d 397].)

Harold Lancer and his next-door neighbors owned homes on top of a hill in Encino, California. Their downhill neighbors included Lawrence and Linda Rauch (the Rauches), and Bradley and Mitzi Kapture (the Kaptures). On February 27, 1998, a portion of the uphill properties failed, causing a landslide. Dirt and debris deluged the backyards of the Rauches and the Kaptures and caused a one-inch bulge in the Rauches' north retaining wall.

Within 24 hours of the slope failure, the City of Los Angeles "yellow tagged" the Rauches' backyard. A yellow tag notice read: "WARNING: THIS SITE HAS BEEN DAMAGED AND MAY BE DANGEROUS TO OCCUPY. FURTHER DAMAGE MAY OCCUR AT ANY TIME. UNAUTHORIZED ENTRY OR OCCUPANCY IS A MISDEMEANOR. . . . [¶] . . . [¶] NO ACCESS TO YARD AREA." The yellow tag remained in the Rauches' backyard more than three years, until at least June 24, 2001. When the city "yellow tagged" the backyard, it also ordered Lancer and the other uphill neighbors to repair the slope.

In February 1999, the Rauches filed suit against Lancer and the other uphill neighbors (*Rauch v. Lancer* (Super. Ct. L.A. County, 1999, No. LC047839)), alleging causes of action for nuisance, trespass, and negligence. In addition to

the above facts, the complaint alleged as follows. The yellow tag prevented the Rauches from using their backyard, which included a swimming pool and spa. The uphill neighbors did not comply with the city's repair order. Mud, debris, vegetation, and water from the uphill neighbors' properties continued to flow onto the Rauches' residence when it rained. The Rauches moved a substantial amount of their personal property from the residence and placed it in storage. Their living conditions deteriorated substantially; their residence lost most, if not all, of its market value; and their family life was materially disrupted. The slope remained unstable, posing a risk of additional slippage and further damage to the Rauches. As relief, the complaint sought general damages and injunctive relief to abate the nuisance.

Cross-complaints were filed in the *Rauch* case, including cross-complaints between Lancer and another uphill neighbor for indemnity and comparative fault. Several settlements were reached before the case went to trial.

In February 1999, in a separate case, the Kaptures, among others, brought claims against Lancer and the uphill neighbors for nuisance, trespass, and negligence (*Shephard v. Lancer* (Super. Ct. L.A. County, 1999, No. LC048012) (*Kapture* case)).

Lancer had obtained a homeowners policy from Fireman's Fund Insurance Company, effective June 24, 1997, to June 24, 1998. Fireman's Fund renewed the policy in three subsequent years, each for a one-year period. The last policy expired on June 24, 2001. The premium went up every year but the last, when it dropped, averaging about $1,600 per year. Each policy had a $1,000 deductible. The policies covered claims against Lancer seeking damages for property damage, bodily injury, and personal injury caused by an occurrence. The limit of liability in each policy was $500,000 per occurrence.

Safeco Insurance Company of America issued a personal umbrella policy to Lancer, effective July 9, 1997, to July 9, 1998. It was renewed annually in two subsequent years, the last policy expiring on July 9, 2000. The Safeco policies covered property damage and personal injury caused by an occurrence. The limit of liability was $5 million per occurrence. The Safeco coverage did not apply to an occurrence until Lancer had exhausted the limits available under all other underlying insurance. Safeco was therefore an excess insurer.

In the *Rauch* and *Kapture* cases, Lancer sought a defense and indemnity from Fireman's Fund and Safeco. In or about June 2001, the *Kapture* case settled for $175,000. On June 8, 2001, Fireman's Fund contributed $50,000 to the settlement. The rest of the settlement was covered by the other uphill neighbors. The *Kapture* case came to an end.

In the *Rauch* action, the cross-complaints between Lancer and the other uphill neighbor were settled by agreement that each pay $1.1 million into a trust to repair the slope. On August 8, 2001, Fireman's Fund paid $450,000 toward the settlement. It then took the position that it had exhausted its policy limits of $500,000, arguing that the slope failure had caused only one occurrence under the first of its four policies. Nevertheless, Fireman's Fund agreed to continue defending Lancer, subject to a reservation of rights to seek reimbursement of defense costs from Safeco. Fireman's Fund spent an additional $265,000 in that regard. For its part, Safeco contributed $450,000 toward the settlement of the same cross-complaints, subject to a reservation of rights to seek reimbursement from Fireman's Fund.

In 2001, the complaint in *Rauch* was tried in two phases. In phase I, the superior court heard evidence regarding the condition of the slope, declared it a nuisance, and ordered that it be abated. The court directed Lancer and the other uphill neighbors to implement a repair plan to be approved by the city and determined that the repairs would cost $3,795,448. Lancer and the other uphill neighbors were found jointly and severally liable for that sum and were instructed to deposit the funds, including all prior settlements, into one or more interest-bearing accounts. The court appointed a receiver to control the funds and supervise the project.

In phase II, a jury found for the Rauches on the nuisance and negligence causes of action and for Lancer and the other uphill neighbors on the trespass claim. The jury found Lancer 50 percent at fault for the slope failure. It awarded $75,500 in economic damages for loss of use and relocation expenses, and $12,500 in noneconomic damages for annoyance, discomfort, and inconvenience.

On September 24, 2003, the superior court entered judgment in favor of the Rauches for $75,500 in economic damages, $12,500 in noneconomic damages, $26,718 in postverdict interest, $65,785 in investigative costs (see *Stearman v. Centex Homes* (2000) 78 Cal.App.4th 611, 625 [92 Cal.Rptr.2d 761]), and $26,992 in litigation costs. Defendants were also ordered, jointly and severally, to deposit $3,795,448 into a fund for slope repairs.

Taking into account the jury's finding that Lancer was 50 percent at fault, his share of the judgment exceeded $2 million. Lancer paid a portion of the judgment with settlements from other parties. Fireman's Fund paid at least $765,000 in the case, including: (1) $500,000 toward settlement of the *Kapture* case and the cross-complaint against Lancer in *Rauch*; and (2) $265,000 in defense costs after the settlement payments. Safeco paid $1.53 million on Lancer's behalf: (1) $44,000 of the Rauches' damages; and (2) $1.49 million of the repair fund (including $275,000 of the fund for which Lancer's codefendants were responsible but could not pay).

In July 2002, Safeco filed this declaratory relief action against Fireman's Fund in which it claimed that Fireman's Fund's policies provided Lancer with $500,000 in coverage for property damage and an additional $500,000 in coverage for personal injury during each of Fireman's Fund's four policy periods, for a total of $4 million.

Fireman's Fund filed a cross-complaint against Safeco, alleging three causes of action: declaratory relief, equitable subrogation, and equitable indemnity. Fireman's Fund requested a declaration that it owed Lancer $500,000 in indemnity for a single occurrence and sought, through subrogation and indemnity, to recover the amount it had paid after the $500,000, namely, $265,000 in defense costs.

In February 2004, the insurers filed cross-motions for summary judgment, arguing the points made in their respective pleadings. The parties stipulated to the material facts. The trial court granted Fireman's Fund's motion, concluding that there was a single occurrence during a single policy period, resulting in $500,000 in coverage for the slope failure. The court denied Safeco's motion. Judgment was entered in favor of Fireman's Fund for $265,000. Safeco appealed.

## II

## DISCUSSION

A motion for summary judgment must be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

" ' "A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact." ' " (*Raghavan v. Boeing Co., supra*, 133 Cal.App.4th at p. 1132.)

### A. *Principles of Insurance Coverage*

"Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation. . . . 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a

contract must give effect to the "mutual intention" of the parties. ". . . Such intent is to be inferred, if possible, solely from the written provisions of the contract. . . . The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' . . . , controls judicial interpretation." ' " (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 647–648 [3 Cal.Rptr.3d 228, 73 P.3d 1205], citations omitted.) The goal is to protect the mutual intentions of the insured and the insurer. (See *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 754, 756–757 [27 Cal.Rptr.3d 648, 110 P.3d 903]; *Gravillis v. Coldwell Banker Residential Brokerage Co.* (2006) 143 Cal.App.4th 761, 774–775 [49 Cal.Rptr.3d 531]; *California Automobile Ins. Co. v. Hogan* (2003) 112 Cal.App.4th 1292, 1299 [5 Cal.Rptr.3d 761].)

■ " '[A] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. . . . "[T]he carrier must defend a suit which *potentially* seeks damages within the coverage of the policy." . . . Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. . . .' . . .

" 'The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. . . .' . . . '[F]or an insurer, the existence of a duty to defend turns not upon the ultimate adjudication of coverage under its policy of insurance, but upon those facts known by the insurer at the inception of a third party lawsuit. . . . Hence, the duty "may exist even where coverage is in doubt and ultimately does not develop." ' " (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153], citations omitted.)

The term "trigger of coverage" is often used in connection with the duty to defend. "The word 'trigger' is not found in the . . . policies themselves, nor does the Insurance Code enumerate or define 'trigger of coverage.' Instead, 'trigger of coverage' is a term of convenience used to describe that which, under the specific terms of an insurance policy, must happen in the policy period in order for the *potential* of coverage to arise. The issue is largely one of timing—what must take place *within the policy's effective dates* for the potential of coverage to be 'triggered'?" (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 655, fn. 2 [42 Cal.Rptr.2d 324, 913 P.2d 878] (*Montrose II*).)

■ "The obligation to indemnify must be distinguished from the duty to defend. The duty to defend arises when there is a *potential* for indemnity." (*Montrose II, supra,* 10 Cal.4th at p. 659, fn. 9.) "[W]here successive [liability] policies have been purchased, bodily injury and property damage that is continuing . . . throughout more than one policy period is *potentially* covered by all policies in effect during those periods." (*Id.* at pp. 686–687, italics added.) "The obligation to indemnify, on the other hand, arises when the insured's underlying liability is established. . . . Although an insurer may have a duty to defend, it ultimately may have no obligation to indemnify, either because no damages were awarded in the underlying action against the insured, or because the actual judgment was for damages not covered under the policy." (*Id.* at p. 659, fn. 9, citations omitted.) "Whether coverage is ultimately established in any given case may [also] depend on . . . the existence of express conditions or exclusions in the particular contract of insurance under scrutiny, the availability of certain defenses that might defeat coverage, and a determination of whether the facts of the case will support a finding of coverage." (*Id.* at p. 655, fn. 2.)

"The insurer's duty to indemnify runs to claims that are actually covered, in light of the facts proved. . . . By definition, it entails the payment of money in order to resolve liability." (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 46 [65 Cal.Rptr.2d 366, 939 P.2d 766], citations omitted.) "Both the duty to indemnify and the duty to defend are in fact dependent on coverage—the former on actual coverage, the latter on at least potential coverage." (*Id.* at p. 47, fn. 10.) In determining indemnity, "courts must focus on the nature of the risk and the injury, in light of the policy provisions," not on the "injured party's choice of remedy or the form of action sought." (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 840 [88 Cal.Rptr.2d 366, 982 P.2d 229].) Here, the litigation has moved beyond the pleading and discovery stages, to judgment. We are therefore concerned primarily with indemnity (actual coverage), not the duty to defend (potential coverage).

Last, although the parties to this action are a primary insurer and an excess insurer, the dispute focuses on the coverage afforded the insured by the primary policies. We therefore interpret the provisions of the primary policies—as do the parties—without regard to the existence of the excess coverage. (See *Montrose II, supra,* 10 Cal.4th at pp. 663–666 [courts must consider context in which insurance policy dispute is litigated].)

## B. *Fireman's Fund Policies*

The material provisions of the four Fireman's Fund policies were identical. The insuring provisions were contained in "Coverage E—Personal Liability." They stated: "If a claim is made or a suit is brought against an 'insured' for

damages because of 'bodily injury', 'personal injury', or 'property damage' caused by an 'occurrence' to which this coverage applies, we will:

"1. Pay up to our limit of insurance for the damages for which the 'insured' is legally liable. Damages include prejudgment interest . . . ; and

"2. Provide a defense at our expense by counsel of our choice. . . . Our duty to settle or defend ends when the amount we pay for damages resulting from the 'occurrence' equals our limit of insurance." The limit of insurance, or policy limits, for Coverage E was $500,000 "per occurrence."

"Property damage" was defined as "physical injury to, destruction of, or loss of use of tangible property." "Bodily injury" meant "bodily harm, sickness or disease . . . ." "Personal injury" was defined as "injury, including bodily or mental harm, arising out of any of the following acts: [¶] a. False arrest, detention or imprisonment; [¶] b. Malicious prosecution; [¶] c. *Wrongful entry* or *eviction*; [¶] d. Defamation, libel, slander; or [¶] e. Invasion of privacy." (Italics added.) Under the heading, "Policy Period," the policy stated that it "applies only to . . . 'bodily injury', 'personal injury', or 'property damage' . . . which occurs during the policy period." The inclusive dates of the policy period—one year in each instance—appeared on the declarations page of each policy.

There were two definitions of "occurrence," depending on the type of harm involved. For "property damage" and "bodily injury," "occurrence" meant "[a]n accident, including continuous or repeated exposure to the same or similar harmful conditions, which results, during the policy period, in 'bodily injury' or 'property damage.' " For "personal injury," "occurrence" was defined as "[a]n act or series of acts of the same or similar nature that occurs during the policy period and which results in 'personal injury.' "

The policy contained a "Limit of Liability" provision, stating: "Our total liability under Coverage E for all damages resulting from any one 'occurrence' will not be more than the limit of insurance for Coverage E[, $500,000,] as shown in the Declarations. The limit is the same regardless of the number of 'insureds', claims made or persons injured. All 'bodily injury' and 'property damage' resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of 'one occurrence.' "

C. *Safeco Policies*

The Safeco policies provided Lancer with excess coverage. For our purposes, the insuring provisions of the Safeco policies and the Fireman's

Fund policies were essentially the same, except Safeco was subject to policy limits of $5 million per occurrence. Safeco states in its opening brief that its policies covered the damages awarded against Lancer, assuming the Fireman's Fund benefits were exhausted.

D. *Fireman's Fund's Liability*

As stated, each Fireman's Fund policy had limits of $500,000 per occurrence. Under the insuring provisions, once Fireman's Fund paid that amount in indemnity, it was no longer obligated to pay defense costs or indemnity under the policy. Safeco contends that Fireman's Fund is liable for multiple policy limits because (1) each policy contained more than one definition of "occurrence," and (2) both property damage and personal injury occurred during all four policy periods. Based on the language of the policies and the cause of the damage in this case, we reject those contentions.

The landslide unquestionably resulted in an "occurrence" of "property damage" during the first policy period: The Rauches' backyard—"tangible property"—suffered "property damage" as a consequence of an "accident." (See *Borg v. Transamerica Ins. Co.* (1996) 47 Cal.App.4th 448, 456–457 & fn. 2, 460–461 [54 Cal.Rptr.2d 811] (*Borg*) [loss of use]; *City of Mill Valley v. Transamerica Ins. Co.* (1979) 98 Cal.App.3d 595, 598–600 [159 Cal.Rptr. 635] [physical injury].) The landslide may have also resulted in "personal injury" under the first policy, specifically, "wrongful entry or eviction" (see *Martin Marietta Corp. v. Insurance Co. of North America* (1995) 40 Cal.App.4th 1113, 1123–1132 [47 Cal.Rptr.2d 670])—an issue we do not decide.

The Fireman's Fund policy contained two definitions of "occurrence," one for "property damage" and another for "personal injury." Safeco argues that when a single event, such as a landslide, results in *both* types of harm, there are two occurrences under each policy for purposes of determining policy limits. Not so.

The different definitions of "occurrence" simply determined whether coverage existed under a particular policy. (See *Whittaker Corp. v. Allianz Underwriters, Inc.* (1992) 11 Cal.App.4th 1236, 1241–1243 [14 Cal.Rptr.2d 659].) As defined in the policies, an "occurrence" of "property damage" triggered coverage based on when the *damage* took place, not when the wrongful act was committed. (See *Montrose II, supra,* 10 Cal.4th at pp. 667–670.) On the other hand, under the definition of "occurrence" for "personal injury," "[i]t is the insured's *wrongful act,* not [the] injury to the third party claimant, that triggers coverage . . . ." (*North American Building Maintenance, Inc. v. Fireman's Fund Ins. Co.* (2006) 137 Cal.App.4th 627, 633, fn. 4 [40 Cal.Rptr.3d 468], italics added.)

Thus, the definitions of "occurrence" determined *if* a particular policy provided coverage, not the *amount* of coverage. Put another way, in determining which policies provided coverage, the definitions of "occurrence" meant that property damage claims triggered policies in effect at the time of the damage; personal injury claims triggered policies in effect when the wrongful act took place. (See *Montrose II, supra*, 10 Cal.4th at pp. 669–673; *North American Building Maintenance, Inc. v. Fireman's Fund Ins. Co., supra*, 137 Cal.App.4th at p. 633, fn. 4.)

■  Fireman's Fund's liability under the policies is determined on a "per occurrence" basis. In determining policy limits, "*occurrence* has generally been held to mean the underlying cause of the injury, rather than the injury or claim itself; otherwise, the insurer's effort to limit its liability per occurrence would be substantially weakened." (*Whittaker Corp. v. Allianz Underwriters, Inc., supra*, 11 Cal.App.4th at p. 1242, italics added; see *id.* at pp. 1241–1243 [discussing causation analysis]; *EOTT Energy Corp. v. Storebrand Internat. Ins. Co.* (1996) 45 Cal.App.4th 565, 575–578 [52 Cal.Rptr.2d 894] [discussing cases].) "When there is a single cause of multiple injuries (or a number of causes that result in a greater number of injuries), courts often look to the cause rather than the injuries in determining the *amount* of insurance coverage. In such a case, the result is a finding of only one claim, i.e., the court looks to the single cause rather than to the multiple injuries." (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins.* Co. (1993) 5 Cal.4th 854, 863 [21 Cal.Rptr.2d 691, 855 P.2d 1263], italics added; see *id.* at pp. 862–865 [discussing causation analysis].)

"Liability policies invariably contain limits on the insurer's liability for covered events. Such limits are usually stated in terms of a certain amount for *each* 'occurrence,' 'accident' or 'claim' during the policy period." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2006) ¶ 7:361, p. 7A-115.) For this purpose, "[t]he number of 'occurrences . . .' . . . . depends on the *cause* of injury rather than the number of injurious effects . . . ." (*Id.*, ¶ 7:369, p. 7A-117.) "[W]here *one* proximate, uninterrupted, and continuing cause results in injuries . . . to . . . property, there is a *single* accident or occurrence within the meaning of the 'per accident' clause in the liability insurance policy limiting the insurer's liability to a certain amount for each accident or each occurrence." (12 Couch on Insurance (3d ed. 2005) § 172:12, p. 172-19, italics added; accord, *Hyer v. Inter-Insurance Exchange, etc.* (1926) 77 Cal.App. 343, 350 [246 P. 1055].)

■  " 'When all injuries emanate from a common source . . . , there is only a single occurrence for purposes of policy coverage. It is irrelevant that there are multiple injuries or injuries of different magnitudes, or that the injuries extend over a period of time. Conversely, when a cause is interrupted,

or when there are several autonomous causes, there are multiple "occurrences" for purposes of determining policy limits and assessing deductibles.' " (*Caldo Oil Co. v. State Water Resources Control Bd.* (1996) 44 Cal.App.4th 1821, 1828 [52 Cal.Rptr.2d 609], italics added; accord, *State Farm Fire & Cas. Co. v. Kohl* (1982) 131 Cal.App.3d 1031, 1035 [182 Cal.Rptr. 720].)

In sum, "[f]or purposes of determining the *number* of policy limits (or deductibles) available, 'occurrence' focuses on the event or events *causing* the injury. But in determining . . . *which* policy or policies provide coverage [for property damage]—the focus is on the *timing of the injury or damage*; i.e., whether the injury or damage took place during the policy period." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 7:375, p. 7A-119.)

Here, there was one uninterrupted cause or event—the landslide—that resulted in all the damage. Some of the damage—loss of use—may have continued into subsequent policy periods. But the existence of only one cause or event means there was only one occurrence for determining policy limits. (See, e.g., *Montrose II, supra*, 10 Cal.4th at p. 672 [freight train derailment is one occurrence for determining policy limits]; *Caldo Oil Co. v. State Water Resources Control Bd., supra*, 44 Cal.App.4th at pp. 1826–1829 [leakage from two storage tanks located on different sites constituted two occurrences for purposes of policy limits].)

Safeco's reliance on the policy's "Limit of Liability" provision is misplaced. That provision stated in part that "[a]ll '*bodily injury*' and '*property damage*' resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of 'one occurrence.' " (Italics added.) Safeco deems it significant that Fireman's Fund did not include "*personal injury*" in the provision. This omission, Safeco contends, means that a single occurrence of property damage can simultaneously give rise to *additional* occurrences under the personal injury coverage in determining policy limits—for example, a second occurrence for wrongful entry and yet a third for wrongful eviction. But, as we have explained, policy limits are determined by the cause of the damage. Here, there was only one cause regardless of the number of injurious effects. (See *State Farm Fire & Casualty Co. v. Elizabeth N.* (1992) 9 Cal.App.4th 1232, 1236–1237 [12 Cal.Rptr.2d 327].)

■ And Safeco can hardly rely on a provision *limiting* an insurer's liability per occurrence in arguing for *higher* policy limits. (Cf. *Elysian Investment Group v. Stewart Title Guaranty Co.* (2002) 105 Cal.App.4th 315, 324 [129 Cal.Rptr.2d 372] [" 'an exclusion cannot act as an additional grant

or extension of coverage' "]; *Ray v. Valley Forge Ins. Co.* (1999) 77 Cal.App.4th 1039, 1048 [92 Cal.Rptr.2d 473] ["policy exclusions do not create coverage"].) "[T]he very purpose of a limitation of liability clause is to permit a carrier to anticipate the amount of risk it takes on, charge appropriately for bearing that risk, and avoid unforeseeable risk." (*Nippon Fire & Marine Ins. v. Skyway Freight* (S.D.N.Y. 1999) 45 F.Supp.2d 288, 294, app. dism. (2d Cir. 2000) 235 F.3d 53.) "[The clause] is to protect the issuing insurer from a claim that each instance of exposure constitutes a separate occurrence for which an independent claim up to the policy limits can be made." (*Scottsdale Ins. v. American Empire Surplus Lines* (D.Md. 1993) 811 F.Supp. 210, 216.)

Nor is it relevant that the resulting damage may have continued into subsequent policy periods. Policy limits are based on the number of occurrences, not the amount, type, or timing of the damage. Fireman's Fund was obligated to pay up to $500,000 "per occurrence." An occurrence of property damage was defined as "an accident, *including* continuous . . . exposure to the same or similar harmful conditions, which results during the policy period, in . . . 'property damage.' " (Italics added.) This definition distinguishes between a precipitating act or event ("an accident, including . . . exposure") and the ensuing harm ("property damage"). (See *Montrose II, supra,* 10 Cal.4th at pp. 668–673.) *Both* are necessary to constitute an "occurrence." (See *id.* at p. 668, fn. 12 [distinguishing between an occurrence and the resulting loss of use].) The phrase "including continuous . . . exposure" does not dispense with the requirement of a precipitating act or event. Rather, it makes clear that the act or event does not have to be sudden for coverage to apply. (*Id.* at p. 672.) Thus, the mere continuation of damage during successive policy periods, by itself, does not create a series of indefinitely ongoing occurrences. A subsequent policy period that consists solely of preexisting or continuing damage, without another precipitating act or event, does not provide additional benefits. Assuming there was a loss of use that continued after the first policy period, there was still only one precipitating act or event, that is, only one "occurrence": the landslide, which resulted in the loss of use.

Further, " 'this definition [of "occurrence"] includes the word "accident." This [was] done in order to clarify the intent with respect to time of coverage and application of policy limits, particularly in situations involving a related series of events attributable to the *same factor*. Under such circumstances only *one accident or occurrence* is intended as far as the application of *policy limits* is concerned.' " (*Montrose II, supra,* 10 Cal.4th at p. 672, italics added & omitted.)

■ Turning to the coverage for "personal injury," an occurrence meant "[a]n act or series of acts of the same or similar nature that occurs during the

policy period and which results in 'personal injury.' " " 'In the world of liability insurance, personal injury coverage applies to injury which arises out of the commission of certain enumerated acts or offenses. . . . Coverage thus is triggered by the offense, not the injury or damage which a plaintiff suffers.' " (*Martin Marietta Corp. v. Insurance Co. of North America, supra,* 40 Cal.App.4th at p. 1124, citation omitted.) If a wrongful entry or eviction occurred in this case, the "offense" was committed during the first policy period. A reasonable interpretation of the policies does not support a conclusion that the Rauches were continuously or repeatedly *evicted.* Within 24 hours after the landslide, the city declared their backyard off-limits. The Rauches were evicted once, at that time, if at all. And there was no finding at trial to the effect that another wrongful *entry* took place after the landslide.

Safeco counters that the coverage for "personal injury" encompasses nuisances and that nuisances are *continuing* offenses. (See *Remmer v. Glens Falls Indem. Co.* (1956) 140 Cal.App.2d 84, 88–89 [295 P.2d 19] (*Remmer*); *Borg, supra,* 47 Cal.App.4th at pp. 460–462; *Mangini v. Aerojet-General Corp.* (1996) 12 Cal.4th 1087, 1099–1103 [51 Cal.Rptr.2d 272, 912 P.2d 1220]; *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1219 [52 Cal.Rptr.2d 518].) Of course, the continuing nature of a nuisance is an aspect of *substantive nuisance law.* (See *Remmer, supra,* 140 Cal.App.2d at pp. 88–89; *Borg, supra,* 47 Cal.App.4th at pp. 460–462; *Mangini, supra,* 12 Cal.4th at pp. 1099–1103; *Beck Development Co., supra,* 44 Cal.App.4th at p. 1219.) That law may have played a role at trial in determining the Rauches' damages. But the *insurance policy* does not use the term "nuisance" or refer to nuisance law. "[T]he proper issue here is whether the *facts* of this case fit within the policies' personal injury coverage, not whether *nuisance* . . . fit[s] under the personal injury coverage." (*Travelers Indem. Co. v. Summit Corp.* (Ind.Ct.App. 1999) 715 N.E.2d 926, 937, italics added, fn. omitted.) As noted, under the policy language, the offenses of wrongful entry and eviction *occurred,* if at all, when they were *committed*— during the first policy period—not at the time of the injury or damage. (See *Martin Marietta Corp. v. Insurance Co. of North America, supra,* 40 Cal.App.4th at p. 1124; *North American Building Maintenance, Inc. v. Fireman's Fund Ins. Co., supra,* 137 Cal.App.4th at p. 633, fn. 4.) In short, the timing and duration of damage did not determine coverage for wrongful entry or eviction. (See *Martin Marietta Corp., supra,* 40 Cal.App.4th at p. 1124; *North American Building Maintenance, Inc., supra,* 137 Cal.App.4th at p. 633, fn. 4.)

Nothing in *Remmer, supra,* 140 Cal.App.2d 84, or *Borg, supra,* 47 Cal.App.4th 448, is to the contrary. *Remmer* involved insured homeowners who graded and filled a portion of their lot in a faulty manner. Years later, a landslide occurred, damaging the property of the downhill neighbor. The downhill neighbor sued the insureds for creating a nuisance, and they, in turn,

looked to their insurer for a defense under a single policy. The court recognized that a nuisance is of a continuing nature (see *Remmer, supra*, 140 Cal.App.2d at pp. 88–89) but distinguished between an "occurrence" and the resulting damage. It held that the nuisance did not trigger potential coverage, and thus did not require a duty to defend because, although the wrongful act (the grading and filling) occurred during the policy period, the damage did not arise until after the policy had expired. (*Id.* at pp. 88–90.)

Similarly, in *Borg, supra*, 47 Cal.App.4th 448, where the insured's over-hanging deck encroached upon a neighbor's property, causing an ongoing loss of use over a period of years, the court held that the policy provided potential coverage because it was in effect during the neighbor's loss of use (damage), even though it was not in effect when the encroaching deck was built (the wrongful act was committed).

Neither *Remmer* nor *Borg* concerned multiple policies or the determination of policy limits. Both cases involved the trigger of coverage in determining the duty to defend under a single policy. They simply illustrate the rule, set forth in *Montrose II, supra*, 10 Cal.4th 645, that for purposes of property damage liability, " 'the time of the occurrence of an accident . . . is not the time the wrongful act was committed, but the time when the complaining party was actually damaged.' " (*Id.* at p. 670, quoting *Remmer, supra*, 140 Cal.App.2d at p. 88.)

Our interpretation of the policy—that there was one occurrence—is consistent with the reasonable expectations of the insured. According to Safeco, when the landslide happened, it simultaneously gave rise to personal injury and property damage in a variety of ways. As the mud and debris initially crossed the Rauches' property line, it caused a wrongful entry; as it moved onto their property, it caused physical injury; and after it ended, it resulted in a wrongful eviction and an ongoing loss of use. Yet, notwithstanding these various types of harm, the insured would perceive them all as the result of a single discrete event—the landslide. Nor would the insured believe that by paying annual premiums of around $1,600, he was entitled to an additional $500,000 per year in benefits, for a total of $2 million, based on conditions that remained static after the landslide: The insured's slope and the Rauches' backyard were unchanged during the successive policy periods, resulting in a jury award of around $88,000 for loss of use.

As one court explained in a case involving continuing damage caused by hazardous waste disposal: "[The insured] contends that the contract definition of 'occurrence' is so broad that an occurrence is ongoing as long as any harm from loss of use of property continues as a result of presence in or upon the property of any contaminant deposited there years earlier. Thus, the argument

goes, an 'occurrence' type of liability insurance coverage, in each new policy period, provides more coverage, added to that existing under policies for previous policy periods, until all contaminants that impair use of the property have been removed. Such an interpretation of liability insurance contracts would indeed tap vastly more insurance resources to help pay for the consequences of ill-advised toxic waste disposal. But a moment's reflection on the resulting extraordinary expansion of coverage, beyond anyone's reasonable expectations at the time of issuance of liability insurance coverage . . . , is enough to cause a court concern about fidelity to the judicial role. Taking this course, a court would be engaging in . . . expand[ing] coverage beyond the terms of the contract between the parties, construed in accordance with ordinary rules of contract law." (*Interex Corp. v. Atlantic Mut. Ins. Co.* (D.Mass. 1995) 874 F.Supp. 1406, 1411–1412.)

For its part, Safeco argues that the allegations of the complaint *triggered* all of the Fireman's Fund policies. That may be true. But a triggered policy is not necessarily a policy that pays. (See *Montrose II, supra,* 10 Cal.4th at pp. 655, fn. 2, 659, fn. 9.) As stated, Fireman's Fund was required to pay up to $500,000 per occurrence, and there was only one occurrence. Having paid that amount in indemnity, Fireman's Fund had no further duty to pay for defense or indemnity regardless · of *potential* coverage under successive policies. Although the complaint in *Rauch* alleged that, after the landslide, mud and debris from Lancer's property continued to flow onto the Rauches' residence when it rained, neither the stipulated facts nor the evidence on the insurers' cross-motions for summary judgment supported that allegation.

Finally, we note that many comprehensive general liability policies obligate the insurer to " 'pay on behalf of the insured *all sums* which the insured shall become legally obligated to pay as damages because of . . . property damage . . . .' " (*Montrose II, supra,* 10 Cal.4th at p. 656, italics added.) Because the insurer agrees to pay "all sums," the policy language may support an argument that the insured is entitled to the policy limits under successive policies even though there is only one occurrence. (See, e.g., *Stonewall Ins. Co. v. City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810, 1834, 1849, 1855 [54 Cal.Rptr.2d 176]; *FMC Corp. v. Plaisted & Companies* (1998) 61 Cal.App.4th 1132, 1182–1191 [72 Cal.Rptr.2d 467]; Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 7:376.2, p. 7A-120.) This argument, which could result in "stacking" policy limits, has no application to the homeowners policy here, under which the insurer agreed to "[p]ay *up to our limit of insurance*[, $500,000 *per occurrence,*] for the damages for which the 'insured' is legally liable." (Italics added.) As we have discussed, there was only one occurrence in this case, entitling the insured to $500,000 in indemnity under the first policy.

Accordingly, the trial court properly concluded that Fireman's Fund satisfied its obligations under the policies once it paid $500,000 toward the settlement of the *Rauch* and *Kapture* cases.

## III

## DISPOSITION

The judgment is affirmed.

Jackson, J.,* concurred.

**VOGEL, J., Concurring.**—I concur but write separately to emphasize a few points.

## A.

These are the pertinent facts.

Harold Lancer, the insured, owned a house on the top of a slope. Lawrence and Linda Rauch (collectively Rauch) lived at the bottom of the slope, which failed on February 27, 1998, at which time mud and debris flowed onto Rauch's property. Rauch lost the use of his backyard and had to move some of his personal property into storage. The City of Los Angeles ordered Lancer to repair the slope but he did not comply with the order. In February 1999, Rauch sued Lancer and the other uphill owners for damages and injunctive relief on theories of negligence (failure to maintain the slope), trespass (by the mudslide) and nuisance (the continuing risk of "additional slippage"). Another action against the same defendants was filed by Rauch's downhill neighbors and various cross-complaints were filed.

At the time of the landslide, Lancer was insured (1) by a $500,000 Fireman's Fund Insurance Company homeowners policy and (2) by a $5 million Safeco Insurance Company of America personal umbrella policy. The Fireman's Fund policy was effective from June 1997 to June 1998, and was renewed annually for three years, through June 2001; the Safeco policy was effective from July 1997 to July 1998, and was renewed annually for two years, through July 2000.

---

*Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Lancer notified both Fireman's Fund and Safeco of the lawsuits, and Fireman's Fund provided a defense in both Rauch's action and his downhill neighbors' action. Before Rauch's action went to trial, Fireman's Fund's contributions to various settlements exceeded $500,000, and Fireman's Fund took the position that its homeowners policy limits were exhausted. When Safeco disagreed, Fireman's Fund continued to defend Lancer in Rauch's action, subject to a reservation of its right to recover certain postexhaustion defense costs from Safeco.

Rauch's action was tried in part to the court, in part to a jury. The court found there was a nuisance, ordered Lancer and his uphill neighbors to repair the slope according to a particular plan approved by the city, and determined that the cost of the repair would be about $3.8 million. The damage issues were then tried to a jury, which found for Lancer on the trespass claim but against him on Rauch's negligence and nuisance causes of action. The jury awarded $75,500 to Rauch for his relocation costs and loss of use of his backyard, and $12,500 in noneconomic damages (annoyance and inconvenience), to which the court added interest, costs of developing the repair plan, and litigation costs. Fireman's Fund contributed $265,000 in defense costs in Rauch's action, and Safeco paid the remaining amounts owed by Lancer.

In 2002 (before Rauch's action was concluded), Safeco filed this declaratory relief action against Fireman's Fund, claiming that Lancer was covered not only by the 1998 homeowners policy in effect on the date of the landslide but also by the three successive policies—and that each policy provided $1 million in coverage, $500,000 for property damage and an additional $500,000 for personal injury, a total of $4 million. Fireman's Fund cross-complained against Safeco for declaratory relief, equitable subrogation, and equitable indemnity, claiming it owed Lancer only $500,000 for a single occurrence and was entitled to reimbursement from Safeco for its postexhaustion defense costs ($265,000). Following cross-motions for summary judgment based on stipulated facts, the trial court rendered judgment for Fireman's Fund. Safeco appeals.

### B.

These are the pertinent provisions of the Fireman's Fund policies.

"Coverage E" provides personal liability coverage for bodily injury, property damage, and personal injury: "If a claim is made or a suit is brought against an 'insured' for damages because of 'bodily injury,' 'personal injury,' or 'property damage' *caused by an 'occurrence'* to which this coverage applies, [Fireman's Fund] will [¶] 1. Pay up to our limit for insurance for the damages for which the 'insured' is legally liable . . . ; and [¶] 2. Provide a

defense at our expense . . . . Our duty to settle or defend ends when the amount we pay for damages resulting from the 'occurrence' equals our limit of insurance." (Boldface & italics added.)

" 'Property damage' means physical injury to, destruction of, *or* loss of use of tangible property. [¶] 'Personal injury' means injury, including bodily or mental harm, arising out of . . . [*w*]*rongful entry or eviction* . . . . [¶] *'Occurrence' is defined as:* [¶] (1) *An accident, including continuous or repeated exposure to the same or similar harmful conditions, which results, during the policy period, in 'bodily injury' or 'property damage'*; [¶] (2) An act or series of acts of the same or similar nature that occurs during the policy period and which results in 'personal injury.' " (Boldface, italics, & underscoring added.)

Under "Limits of Liability," the policy provides: "Our total liability under Coverage E for all damages resulting from any one 'occurrence' will not be more than the limit of insurance for Coverage E as shown in the Declarations [$500,000]. The limit is the same regardless of the number of 'insureds,' claims made or persons injured. *All 'bodily injury' and 'property damage' resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one 'occurrence.' *" (Boldface & italics added.)

## C.

Rauch's losses (property damage and, if there were any, personal injuries) resulted from a single occurrence in 1998.

Under the plain language of the policy, the "occurrence" was the landslide (*an "accident, including continuous or repeated exposure to the same or similar harmful conditions, which result[ed], during the policy period, in 'bodily injury' or 'property damage' "*) which caused property damage ("physical injury to, destruction of, or loss of use of tangible property"). In order to determine coverage (as opposed to a duty to defend), the number of "occurrences" is calculated by reference to the event causing the injury. (*EOTT Energy Corp. v. Storebrand Internat. Ins. Co.* (1996) 45 Cal.App.4th 565, 576 [52 Cal.Rptr.2d 894]; Croskey, et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2006) ¶ 7:366, p. 7A-117, ¶ 7:369, p. 7A-117, ¶ 7:375, p. 7A-119 [for purposes of determining the number of successive policies available, " 'occurrence' focuses on the event or events *causing* the injury"].)

The landslide was the event that caused the damages, all of which occurred in the 1998 policy year.

## D.

Rauch's continuing loss of the use of his property was neither an "event" nor a separate "occurrence" under the successive Fireman's Fund policies.

Coverage is triggered under the policy in effect during the year in which an occurrence causes either physical injury to, destruction of, or loss of use of tangible property, in which event there is coverage for such damage to the extent of the policy's limits. Rauch's property, once damaged by the 1998 landslide, was covered by Lancer's 1998 Fireman's Fund policy—and the fact that Rauch's loss of use of that property continued into successive policy periods does not mean there was coverage under Lancer's subsequent policies.

The jury in Rauch's case against Lancer found there was a nuisance, which Safeco characterizes as an eviction of Rauch from at least part of his property and a continuing loss during the periods of the successive Fireman's Fund policies. Safeco's argument confuses the causative event with the resulting damage. As noted in the majority opinion and above, the occurrence was the February 1998 landslide, which in one fell swoop damaged Rauch's property, created a nuisance, and caused his partial eviction. The fact that the damage (partial eviction and loss of use) continued into subsequent policy periods does not mean there was more than one occurrence, without which coverage under the subsequent policies was not triggered. (Cf. *Harbor Ins. Co. v. Central National Ins. Co.* (1985) 165 Cal.App.3d 1029, 1036–1038 [211 Cal.Rptr. 902]; see *Interex Corp. v. Atlantic Mut. Ins. Co.* (D.Mass. 1995) 874 F.Supp. 1406, 1411–1412.)

I think this point is best made with an example. Assume there was no landslide but in 1998 Lancer and Rauch discovered the hill was unstable and that there was a possibility the slope might fail (a threat of harm). If Rauch wanted to sell his property, he would have to disclose this known defect to a potential buyer and thus would suffer a loss from the diminution of the value of his property—and he probably could sue Lancer for injunctive relief and damages. But there would be no coverage under the Fireman's Fund policy because there would not have been an occurrence (no act or accident resulting in physical injury to or destruction of the property or loss of its use, or personal injury), notwithstanding that there would have been damage and that the damage might have continued over a period of years if Lancer refused to fix the problem.

In our case, there was a landslide, and there was coverage under the 1998 Fireman's Fund policy for the damage (physical injury, destruction, and loss of use) caused and suffered during the policy period—but not for the continuing loss of use in subsequent policy periods, because there was no occurrence during any of the successive policy periods.

### E.

For these reasons, I agree that the judgment must be affirmed, and that Safeco must reimburse Fireman's Fund for its postexhaustion defense costs.

A petition for a rehearing was denied April 12, 2007.