[No. C019008. Third Dist. Apr. 30, 1996.]

CALDO OIL COMPANY, Plaintiff and Appellant, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants
and Respondents.

1824

## COUNSEL

Gregg S. Garrison and Richard R. Dale for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Roderick F. Walston, Chief Assistant Attorney General, Charles W. Getz IV, Assistant Attorney General, and Mark J. Urban, Deputy Attorney General, for Defendants and Respondents.

## OPINION

**MORRISON, J.**—This is an environmental cleanup case arising in the context of parallel federal and state statutes and regulations which establish what amounts to a government-run insurance pool. The pool reimburses owners of underground storage tanks who clean up leaks. Caldo Oil Company (Caldo) filed a petition seeking a writ of mandate against the State Water Resources Control Board (Board), which had consolidated two reimbursement claims into one claim, reducing the amount of reimbursement available. Caldo's principal contention is that a statutory definition of the term "occurrence," similar to the definition used in the insurance industry, is

thwarted by a Board regulation purporting to implement the statute. We agree and reverse with directions.

## BACKGROUND

The Barry Keene Underground Storage Tank Cleanup Trust Fund Act of 1989 is designed to combat the large number of underground petroleum storage tanks which leak, endangering public health. (Health & Saf. Code, § 25299.10, subd. (b) further section references are to this code.) It was enacted in part "to avoid direct regulation by the federal government" by establishing, as permitted by federal law, a system of "financial responsibility and corrective action requirements" which "will enable private commercial insurers to expand the availability and affordability of insurance coverage." (*Id.*, subd. (b)(7)-(b)(10); see Lathrop, Insurance Coverage for Environmental Claims (1995) Environmental Statutes, § 2.05[2], pp. 2-36 to 2-40 [describing federal environmental statutes regulating tanks].)

An Underground Storage Tank Cleanup Fund was created, which consists of legislative appropriations and other moneys (§ 25299.50), particularly fees collected from specified owners of tanks who pay a storage fee "for each gallon of petroleum placed in an underground storage tank which he or she owns." (§ 25299.41; see § 25299.43.) The fee is not a tax. (§ 25299.40.) The fund disburses money for administrative expenses, to pay for "corrective action" in certain instances and, inter alia, to pay for "claims." (§ 25299.51.)

Tank owners must maintain "financial responsibility" of at least $10,000 per "occurrence," (§ 25299.32) and after taking "corrective action," i.e., cleaning up a spill, they may file a claim for reimbursement. (See § 25299.55.) The Board, by statute, ranks claimants in order of priority. (See § 25299.52.)

The Board may reimburse claimants up to $990,000 for corrective action "for each occurrence." (Former § 25299.57, subd. (a); see now § 25299.57, subd. (a) [up to $1 million].) Under the statutory scheme: " 'Occurrence' means an accident, including continuous or repeated exposure to conditions, which results in an unauthorized release of petroleum from an underground storage tank." (§ 25299.19.)

The challenged regulation provides: " 'Occurrence' means an accident which results in an unauthorized release of petroleum from an underground storage tank. Unauthorized releases caused by several sources but which require only a single site investigation shall be considered as one occurrence. An unauthorized release subsequent to a previous unauthorized release at the

same site shall only be considered a separate occurrence if site investigation and corrective action, exclusive of verification monitoring, have been completed for the prior unauthorized release." (Cal. Code Regs., tit. 23, § 2804; hereafter regulation section 2804 or the regulation.)

### FACTS AND PROCEDURE

■ Although the administrative record was lodged with the trial court it has not been included in the record on appeal. We take the facts from the briefs. (See *County of El Dorado* v. *Misura* (1995) 33 Cal.App.4th 73, 77 [38 Cal.Rptr.2d 908].)

Caldo operates separate tank systems on adjacent parcels in San Jose. Fuel leaked from each system. Caldo claimed reimbursement for each leak, confusingly placing the second leak in the first claim. The first leak was discovered in April 1987. "Claim 3352 indicated that a total of $832,000 had been spent on eligible corrective action at Parcel 2, and estimated that an additional $75,000 would be required to complete the remedial work." The second leak was discovered in December 1987. "Claim 3351 indicates that a total of $882,000 had been spent on corrective action at Parcel 1 and estimated [an] additional $50,000 would be required . . . ."

"On July 23, 1993, the Board issued a decision that combined the two claims based on section 2804 [the regulation] that imposed a limit of $990,000 for reimbursement of the two claims. It reasoned that under [the regulation] a single occurrence would be found where it would be feasible, reasonable, and logical to conduct a single site investigation covering all of the releases. The Board stated:

" 'It obviously was feasible because that is in fact what occurred. Was it logical and reasonable? It seems to us to be so. Abutting parcels were involved. These parcels are owned by the same company, which uses both parcels in combined business activities. The releases on both parcels involve petroleum products. The releases were discovered within a time frame which permitted a single site investigation.' "

Caldo asserted in its mandate petition that it had suffered two occurrences within the meaning of the statutory definition, one at each site, resulting in leakage from two different tank systems of two different types of petroleum fuel. Caldo urged that under the traditional insurance industry definition, these facts represent two occurrences; that the insurance industry definition should govern is implicit in the statutory scheme, designed in part to "enable private commercial insurers to expand the availability and affordability of

insurance coverage." (§ 25299.10, subd. (b)(7); see *id.*, subd. (b)(4).)[1] Caldo also sought a declaration that the regulation was invalid.

The petition was denied. The superior court determined the industry definition of occurrence "is not shown to be sufficient or relevant to the legislative intent;" "[t]he court may properly consider the EPA's apparent determination that the California statute and regulation are not violative of federal law;" and "there is sufficient and substantial evidence to support the Board's decision." Caldo timely appealed.

DISCUSSION

I

■ A regulation interprets or makes specific an agency's administration of a statutory duty. (See Gov. Code, § 11342, subd. (g).) A regulation cannot be used to impair the implementing statute, nor does it confer on the agency the power to limit its statutory duty. (*Bank of Italy* v. *Johnson* (1926) 200 Cal. 1, 15 [251 P. 784] [head of agency "may not by the adoption of any rule of policy or procedure so circumscribe or curtail the exercise of his discretion under the statute as to prevent the free and untrammeled exercise thereof in every case, for an attempt to do so would be for him to arrogate to himself a legislative function"]. See *People* v. *Hall* (1994) 8 Cal.4th 950, 960 [35 Cal.Rptr.2d 432, 883 P.2d 974] [rule cannot impair court's statutory powers]; *Halpin* v. *Superior Court* (1966) 240 Cal.App.2d 701, 706 [49 Cal.Rptr. 857] [Shasta County court order setting fees conflicts with statutory duty to determine reasonable fees, hence, invalid].)

■ In this case the Board has a duty to determine, factually, if an "occurrence" took place and upon such determination the Board is authorized to reimburse tank operators for cleanup costs incurred, to a ceiling of $990,000 per "occurrence." It is undisputed that in making its determination in this case the Board applied to the facts before it the challenged regulation, which, to repeat, defines an occurrence in part as follows: "Unauthorized releases caused by several sources but which require only a single site investigation shall be considered as one occurrence." (Reg., § 2804.)

Such limitation appears nowhere in the statute. It is a creature of the Board.

---

[1]The Board's answer in part denied the existence of the operative statute, on the ground Caldo identified the statute as commencing at section 25299 et seq., instead of at section 25299.*10*, and that Caldo referred to it as the "Petroleum Underground Storage Tank Clean-up Act," rather than the "Barry Keene Underground Storage Tank Cleanup Trust Fund Act of 1989." Such answer served but to vex and annoy; it had no legitimate function.

The statute is plain; to repeat: " 'Occurrence' means an accident, including continuous or repeated exposure to conditions, which results in an unauthorized release of petroleum from an underground storage tank." (§ 25299.19.)

There is nothing in this statute which speaks of site investigations. The regulation does not, as the Board asserts, merely "interpret" the statutory definition; it adds to that definition words and concepts which are not there. (Cf. Code Civ. Proc., § 1858 [one may not "insert what has been omitted"].)

The Legislature used virtually the same definition of "occurrence" which appears in general business liability insurance policies. A typical commercial general liability policy defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," (3 Cal. Insurance Law & Practice (1995) General Liability Policies, appen. C, p. 49-157; Lathrop, Insurance Coverage for Environmental Claims, *supra*, General Liability Insurance, § 3.100[1], p. 3-135) though some policies use the older language "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured" (e.g., *Collin* v. *American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 804 [26 Cal.Rptr.2d 391]; *Dyer* v. *Northbrook Property & Casualty Ins. Co.* (1989) 210 Cal.App.3d 1540, 1546 [259 Cal.Rptr. 298]). (See Lathrop, *supra*, § 3.05[2][b], pp. 3-50 to 3-51 [tracing changes in industry definition].) "[O]ccurrence has generally been held to mean the underlying cause of the injury, rather than the injury or claim itself. . . ." (*Whittaker Corp.* v. *Allianz Underwriters, Inc.* (1992) 11 Cal.App.4th 1236, 1242 [14 Cal.Rptr.2d 659]; see *id.* at pp. 1242-1243.) A leading treatise states this is the general rule: "Under the cause test, there is a single occurrence when 'there was but one proximate, uninterrupted, and continuing cause which resulted in all the injuries and damage.' When all injuries emanate from a common source or process, there is only a single occurrence for purposes of policy coverage. It is irrelevant that there are multiple injuries or injuries of different magnitudes, or that the injuries extend over a period of time. Conversely, when a cause is interrupted, or when there are several autonomous causes, there are multiple 'occurrences' for purposes of determining policy limits and assessing deductibles." (3 Cal. Insurance Law & Practice, *supra*, § 49.18[3][b], pp. 49:54-55, fns. omitted; see *Hyer* v. *Inter-Insurance Exchange, etc.* (1926) 77 Cal.App. 343, 349 [246 P. 1055] ["the word 'accident' is predicated of an occurrence which is the *cause* of the injury"]; see also Lathrop, *supra*, § 6.03[1], p. 6:7-9.)

One treatise posits the following three hypotheticals to illustrate the "continuous or repeated exposure to conditions" clause: First, an above-ground storage tank leaks undetected for a period of time. Any damage "can

be said to be continuous from the initial event." Second, assume the leakage resulted from a transfer line which operates only intermittently. Whenever the transfer line is used, a tank valve leaks. "In this situation, the damage is not caused by a continuous exposure to conditions, *i.e.*, a steady leak from the faulty tank, but rather by a repeated exposure to the same conditions, *i.e.*, the [transfer] line and the faulty valve which intermittently [leaks]." Third, "Change the foregoing hypothetical to include both the faulty tank and the [transfer] line with the faulty valve. If both the tank failure and the valve leakage were the result of . . . over-pressurization, it is arguable that only one occurrence has taken place, *i.e.*, the over-pressurization which resulted in damage. On the other hand, if the tank failure was caused, for example, by a negligent forklift driver who inadvertently punctured the tank without realizing it, while the valve malfunction was caused by the over-pressuriza-tion of the transfer line, it would seem that two occurrences have taken place, because each one resulted from different causal conditions." (Lathrop, Insurance Coverage for Enviromental Claims, *supra*, § 3.05[3], pp. 3-52 to 3-54.) We agree with this causal analysis.

■ Under this rule, construing the statutory definition herein (which tracks the standard insurance industry definition), the facts—so far as we are given the facts—establish two "occurrences" suffered by Caldo. The Board's regulation unjustifiably allowed treatment of two statutory "occurrences" as only one occurrence. Caldo, a tank owner who has presumably been paying into the pool under compulsion of the statutory scheme, has earned an entitlement under that statutory scheme and it is not within the Board's power to take it away by rewriting the statutes passed by the Legislature.

## II

■ The Board makes four specific challenges to the above conclusion: The Board maintains it is entitled to "interpret" the statutory definition in light of a federal Environmental Protection Agency (EPA) regulation; the EPA has given a federal imprimatur to the state regulation; the regulation reasonably limits claims and preserves the fiscal integrity of the fund; and the regulation reflects a long-standing administrative practice to which the courts should defer.

There is nothing in federal law, so far as it has been cited by the Board, which compels the Board's "interpretation" of the statute: The EPA's dis-cussion of the different definitions of occurrence does not change the definition employed by the California Legislature. The EPA's approval of the financial soundness of the Board's regulations neither alters the statutory

definition of occurrence nor reflects a determination on the part of the EPA that the challenged regulation is "valid" either under state or federal law. The fact that "federal law allows for an aggregate limit on payment regardless of the number of occurrences," may mean the Board is not obliged to give Caldo everything Caldo asks for, but such fact does not mean that the Board has the authority to treat two occurrences as one. Finally, the Board's regulation is not insulated from review by this court.

We now explicate these points.

1. *Federal law does not impose any definition of "occurrence"*

A federal EPA regulation uses language similar to section 25299.19: "*Occurrence* means an accident, including continuous or repeated exposure to conditions, which results in a release from an underground storage tank." (40 C.F.R. § 280.92 (1995).)

A note explains "This definition is intended to assist in the understanding of these regulations and is not intended either to limit the meaning of 'occurrence' in a way that conflicts with standard insurance usage or to prevent the use of other standard insurance terms in place of 'occurrence.'" (53 Fed.Reg. 43371 (Oct. 26, 1988) note.) A commentary, discussing the insurance policies which must be required by participating states, explains why the EPA rejected proposals to use the term "pollution incident" in lieu of "accidental release" and "occurrence." The EPA did not want to bind insurance companies: "The rule now allows insurance policies containing alternate definitions of 'occurrence' or standard terms other than 'occurrence,' such as 'pollution incident,' to be used . . . . This definition of occurrence is included in today's rule to assist in the understanding of the financial assurance requirements, i.e., to clarify the scope of coverage required under the rule. It is not intended to limit the meaning of 'occurrence' in a way that conflicts with general insurance industry usage." (53 Fed.Reg. 43334 (Oct. 26, 1988); *id.* at pp. 43333-43334.)

The Board relies on this comment for its claim that "there is no standard, unambiguous definition of the term 'occurrence.'" Assuming this is correct, it does not inform our inquiry, which is whether the California Legislature's chosen definition encompasses the Board's regulation. It does not.

2. *The EPA has not endorsed the definition created by the Board*

With a red herring spawned below and dragged across the briefs on appeal, the Board observes that its regulations had been submitted to the

EPA, which "determined that the California [tank] Trust Fund is an adequate financial assurance mechanism under 40 C.F.R. § 280.101." The Board did submit the regulations to the EPA, which did approve them. The transmittal letter from the Board to the EPA merely outlines certain general criteria which the Board claims it met, such as "Funds must be reasonably certain and available for cleanups"; "The projected flow of revenues into the fund must be sufficient to keep pace with the anticipated rate of expenditures"; and "The types and amounts of coverage the Cleanup Fund will provide should be stated clearly in the statute and regulations." In response, the EPA "determined that the State of California UST [tank] Cleanup Fund (State Fund) is acceptable as a financial assurance mechanism under [specified federal law]." The EPA was "concerned" about a provision allowing "the executive office" to borrow money from the funds and "The State should also be aware that EPA's approval . . . is not an endorsement of that fund for the purpose of State underground storage tank program approval. The purpose of 40 CFR § 280.101 is to provide states with the option of establishing financial assurance programs prior to State program approval. Since EPA is approving [the State Fund] pursuant to [the regulation], EPA's approval of the State Fund does not indicate a determination regarding the State's overall [tank] Program."

The foregoing disclaimer disposes of the Board's position that the EPA somehow ratified the Board's regulation at issue in this case. We need not discuss the question of what authority a federal administrative agency has to interpret California statutes in the context of mixed state and federal programs, except to say that the result of the EPA's *disapproval* of the regulations would not have been to rewrite statutes passed by our Legislature, and it is difficult to see how the EPA's *approval* can accomplish such a goal.

3.   *The regulation is not a "reasonable limitation" on claims*

The Board characterizes the regulation as vital to the financial security of the tank trust fund. As the Board notes aggregate limits are permitted under EPA regulations. (40 C.F.R. § 280.93(b)(1) (1995).) It appears the Legislature has provided for an aggregate limit. (§ 25299.60, subd. (c)(1) ["board shall not pay out any claims pursuant to this article to a claimant if the total amount paid to the claimant is greater than 5 percent of the total amount annually appropriated by the Legislature from the fund for purposes of paying claims pursuant to this article"].) The Board cannot manufacture other, random, obstacles to legitimate claims by perverting the statutory definition of "occurrence."

The Board maintains that, with one exception (see § 25299.58, subd. (d) [bodily injury claims]) the Board may not be required to pay every claim in

full; the $990,000 figure is a ceiling (see former § 25299.57, subd. (a) [Board "may" pay up to the ceiling]). The Board thus contends it is authorized to adopt additional restrictions on claims. The use in the statute of the directory phrase stating the Board "may" pay up to the ceiling does not confer upon the Board the arbitrary power to pay or disallow claims; its discretion is delimited by the statutory scheme. (See *City of Sacramento* v. *Drew* (1989) 207 Cal.App.3d 1287, 1297-1298 [255 Cal.Rptr. 704].) The use of the term "may" could possibly refer to the priority ranking of claims set out in the statute, and no more. In any event, the extent to which the Board "may" reduce a properly tendered claim is not yet at issue in this case, since the Board did not purport to deny part of either claim for any reason; instead it consolidated them into one claim. That act was taken without statutory authority.

The Board poses a hypothetical as follows: "Appellant's interpretation of Health and Safety Code section 25299.19 would effectively eliminate the mandatory and permissive payment limits in state and federal law. The Appellant repeatedly states that each 'accident' is an occurrence, and implies that each cause of damage is an accident. Under this interpretation, each separate UST leak, whether in the same tank or in adjacent tanks, would be a separate occurrence. Thus, if there were three separate leaks in a single UST, the Board would be required to pay up to $2,970,000 for corrective action."

The ceiling statute states "the board shall not reimburse or authorize prepayment of any claim in an aggregate amount exceeding nine hundred ninety thousand ($990,000) for a claim arising from the same event or occurrence." (Former § 25299.59, subd. (e).) If there were three contemporaneous leaks (e.g., a trenching machine tears three holes in one tank, or a hole in each of three tanks), the Board could treat the leaks as a single event or occurrence. If, however, the leaks occurred at separate times, after clean ups had been completed from previous leaks, under the Board's own regulation the owner could be entitled to reimbursement. (See Reg., § 2804 ["An unauthorized release subsequent to a previous unauthorized release at the same site shall only be considered a separate occurrence if site investigation and corrective action, exclusive of verification monitoring, have been completed for the prior unauthorized release."].) We find unpersuasive the Board's hypothetical positing financial ruin for the fund.

4. *The Legislature has not acquiesced in the regulation*

The Board, stating that the regulation at issue was adopted in 1991, points to the rule that "long-standing" administrative practices may support an

inference that the Legislature either adopts or permits such practice in enacting statutes touching on such practice. The regulation here is too young to qualify under the rule and there is no indication it has ever been challenged, or even applied before this case, such that it would come to the Legislature's attention. The rule of construction contended for has no application in this case. (See *Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 753, 757-758 [151 P.2d 233, 155 A.L.R. 405].)

## DISPOSITION

The judgment is reversed with directions to the trial court to grant a writ of mandate compelling the Board to reconsider claim Nos. 3351 and 3352 without regard to the regulation (Reg., § 2804) and issue a declaration that the regulation, to the extent it is inconsistent with this opinion, is invalid. Costs to Caldo.

Puglia, P. J., and Davis, J., concurred.

A petition for a rehearing was denied May 30, 1996, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied August 14, 1996.