[No. A113967. First Dist., Div. One. July 20, 2007.]

MURRAY KELSOE, Plaintiff and Appellant, v.
STATE WATER RESOURCES CONTROL BOARD, Defendant and
Respondent.

570

---

**COUNSEL**

Silicon Valley Law Group and Jeffrey S. Lawson for Plaintiff and Appellant.

Peter J. Niemiec; Downey Brand, Steven H. Goldberg and Nicole E. Granquist for Southeast Towing and Salvage, Inc., as Amicus Curiae on behalf of Plaintiff and Appellant.

Hinson & Gravelle and Douglas A. Gravelle as Amicus Curiae on behalf of Plaintiff and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary E. Hackenbracht, Assistant Attorney General, John Davidson and Michael W. Neville, Deputy Attorneys General, for Defendant and Respondent.

---

**OPINION**

**MARCHIANO, P. J.**—In this case we construe Health and Safety Code section 25299.57 (section 25299.57), which defines eligibility for a state-sanctioned fund for reimbursement of cleanup costs related to leaks from underground storage tanks (UST's).

Plaintiff Murray Kelsoe sought a writ of mandate in the trial court to set aside a decision of defendant California State Water Resources Control Board (Board) declaring him ineligible for the fund because he lacked a permit for his UST's on January 1, 1990, 12 years before his 2002 claim for reimbursement, even though he had a permit since 1994. The Board's decision is based on its interpretation of section 25299.57. The trial court agreed with that interpretation in denying Kelsoe's mandate petition.

As we explain below, the Board should have considered whether plaintiff was entitled to a waiver of the requirement for a permit on January 1, 1990. Such a permit waiver would allow plaintiff's current claim for reimbursement. Accordingly, we reverse for the limited purpose of consideration of a permit waiver.

## I. STATUTORY BACKGROUND

■ During all time periods pertinent to this case, Health and Safety Code section 25284 required that no person could own or operate a UST unless an operating permit had been obtained from the appropriate local agency. (Health & Saf. Code, § 25284, subd. (a)(1).)[1] In the present case the appropriate local agency is Alameda County.

■ The Barry Keene Underground Storage Tank Cleanup Trust Fund Act of 1989 (§ 25299.10 et seq.) (Act) "is designed to combat the large number of underground petroleum storage tanks which leak, endangering public health." (*Caldo Oil Co. v. State Water Resources Control Bd.* (1996) 44 Cal.App.4th 1821, 1825 [52 Cal.Rptr.2d 609] (*Caldo*); see § 25299.10, subd. (b).) The Legislature found that "owners or operators of underground storage tanks have been unable to obtain affordable environmental impairment liability insurance coverage to pay for corrective action or the obtainable coverage has been outside their financial means." (§ 25299.10, subd. (b)(4).) Thus, the Act created the Underground Storage Tank Cleanup Fund (Fund), which is financed by various sources including fees collected from UST owners who pay a fee for each gallon of petroleum placed in a UST. (*Caldo, supra*, at p. 1825; §§ 25299.41, 25299.43, 25299.50.) The fee is not a tax. (§ 25299.40.)

The Fund has been characterized as "amount[ing] to a government-run insurance pool." (*Caldo, supra*, 44 Cal.App.4th at p. 1824.) The Fund pays for claims of reimbursement by UST owners who take " 'corrective action,' " i.e., clean up a leakage or a spill. (*Caldo, supra*, at p. 1825; see §§ 25299.14, 25299.55.) Such owners must maintain a minimal level of " 'financial responsibility' " of $10,000 per " 'occurrence' " in order to make a claim for reimbursement of additional cleanup costs. (*Caldo, supra*, at p. 1825; see §§ 25299.31, 25299.32.)[2]

---

[1] Subsequent statutory references are to the Health and Safety Code.

[2] This encapsulated discussion of the Act and the Fund is by no means comprehensive. In particular, we do not discuss various conditions and qualifications embedded in the statutory language that are not pertinent to the issues before us.

Eligibility for claims is governed by section 25299.57. We deal here with two subdivisions of that statute, subdivisions (a) and (d).[3]

Subdivision (a) of section 25299.57 provides that "[i]f the board makes the determination specified in subdivision (d)," the board may pay the claim—subject to certain matters not relevant here.[4]

Subdivision (d) of section 25299.57 lies at the heart of the present case. We quote its pertinent provisions:

"(d) Except as provided in subdivision (j) [not relevant here], a claim specified in subdivision (a) may be paid if the board makes all of the following findings:

"(1) There has been an unauthorized release of petroleum into the environment from an underground storage tank.

"(2) The claimant is required to undertake or contract for corrective action . . . .

"(3)(A) Except as provided in subparagraph (B), the claimant *has complied* with . . . the permit requirements of Chapter 6.7 (commencing with Section 25280) [including section 25284].

"[(3)](B) All claimants who file their claim on or after January 1, 1994, and all claimants who filed their claim prior to that date but are not eligible for a waiver of the permit requirement pursuant to board regulations in effect on the date of the filing of the claim, and who did not obtain or apply for any permit required by subdivision (a) of Section 25284 by January 1, 1990, shall be subject to subparagraph (A) regardless of the reason or reasons that the permit was not obtained or applied for. However, on and after January 1, 1994, the board may waive the provisions of subparagraph (A) as a condition for payment from the fund if the board finds all of the following:

"(i) The claimant was unaware of the permit requirement prior to January 1, 1990, and there was no intent to intentionally avoid the permit requirement or the fees associated with the permit.

---

[3] To minimize the visual clutter of a discussion of a complicated statute, we henceforth refer to section 25299.57's subdivisions and their subparts in an informal manner, e.g., "subdivision (a)," "subdivision (d)(3)(A)," or "section 25299.57(d)."

[4] As used in the statute, the "board" refers to defendant Board. (§§ 25281, subd. (b), 25299.25.)

"(ii) Prior to submittal of the application to the fund, the claimant has complied with Section 25299.31 [evidence of financial responsibility] and has obtained and paid for all permits currently required by this paragraph.

"(iii) Prior to submittal of the application to the fund, the claimant has paid all fees, interest, and penalties imposed pursuant to Article 5 (commencing with Section 25299.40) and Part 26 (commencing with Section 50101) of Division 2 of the Revenue and Taxation Code for the underground storage tank that is the subject of the claim." (Italics added.)

It is undisputed that the requirements of subdivision (d)(1) and (2) have been satisfied in this case. The issue is whether plaintiff "has complied" with permit requirements within the meaning of subdivision (d)(3)(A), as qualified by subdivision (d)(3)(B).

## II. FACTS

We take the facts from the administrative record, the decision of the Board denying plaintiff eligibility, and the trial court's decision denying the mandate petition. The facts are largely undisputed.

In 1983, plaintiff bought and began to operate the Sunol Tree Gas Station on Andrade Road in Sunol. In December 1984, he replaced the gas station's existing UST's with six new UST's made of fiberglass. According to a declaration of plaintiff filed with the Board on June 26, 2003 (June 26 declaration), "No contamination was discovered at that time."

According to the Board's decision, "The Alameda County Health Care Services Agency (Alameda County) began implementing its UST program in 1987, and claims to have notified all UST owners in their jurisdiction of permitting requirements in 1988. [Plaintiff] states that he did not receive Alameda County's 1988 notification, and there is no record of a 1988 notification in Alameda County's files" for the Sunol Tree Gas Station. In his June 26 declaration, plaintiff states that he did not know about the requirement of an operating permit from Alameda County until 1990 or "[s]ometime in 1991."

On April 24, 1991, Alameda County issued a notice of violation to plaintiff informing him of several violations regarding the gas station, including plaintiff's failure to obtain an operating permit for the UST's pursuant to section 25284. On June 5, 1991, Alameda County issued a second notice of violation.

In 1994, the District Attorney of Alameda County initiated an enforcement action against plaintiff, which led to an August 1994 judgment against plaintiff requiring him to pay civil penalties, comply with the permit requirement of section 25284, and comply with other provisions of the Health and Safety Code.

According to the Board's decision, plaintiff obtained an operating permit for the UST's in late 1994: "In December of 1994, the Sunol Tree Gas Station was brought into UST permit compliance." In December 1995, the enforcement action was settled pursuant to a stipulation and modified judgment. In his June 26 declaration, plaintiff states that "[a]s part of that settlement I paid all back [UST] fees and taxes."

Plaintiff had filed for chapter 11 bankruptcy in January 1993. According to the Board's decision, "[Plaintiff] states that he did not obtain a permit until December of 1994 (even though he became aware of the permit requirements in 1991) because his [bankruptcy] trustee and the trustee's accountant controlled all monies, and that the trustee did not allow the UST's to be tested until 1994." This statement is consistent with plaintiff's June 26 declaration.

Plaintiff closed the Sunol Tree Gas Station in 1998. He received a temporary closure permit for the UST's.

By July of 2001, plaintiff had enough money to upgrade the UST's and reopen the gas station. In April 2002, plaintiff removed five 15,000-gallon UST's and discovered leakage—or, in statutory parlance, "an unauthorized release." Plaintiff spent at least $95,000 towards correcting the contamination caused by the leakage from the UST's.[5]

From 1994 until the time of the discovery of the leak in 2002, plaintiff was in full compliance with the permit requirement for the leaking UST's. It is also undisputed that during those eight years plaintiff "stayed current with [his UST] fees and taxes." Indeed, the trial court found that plaintiff "pa[id] thousands of dollars into the Fund for eight years without receiving any benefit."

On June 25, 2002, plaintiff made a claim against the Fund. The Board denied the claim on the ground that plaintiff was not eligible for the Fund because he was not in compliance with the permit requirement within the

---

[5] In December 2002, plaintiff installed new UST's, obtained new UST permits, and reopened the gas station.

meaning of section 25299.57(d)(3).[6] The Board based this determination of noncompliance on the fact that plaintiff never obtained a permit before January 1, 1990—despite the fact that he did obtain a permit in 1994, from that point on remained in permit compliance, and had a permit at the time the claim was filed in 2002.

In other words, the Board interpreted the phrase "has complied" in subdivision (d)(3)(A) to "mean[] that the claimant must have complied in the past and continues to comply with permit requirements." The Board reasoned that "complied" is the past participle of the verb "comply," and when coupled with the word "has" created the present perfect tense of the verb. "This tense indicates action that was started in the past and has recently been completed or is continuing until the present time." In addition to this grammatical analysis, the Board reasoned that the first sentence of subdivision (d)(3)(B) "conditions eligibility on permit compliance by January 1, 1990. If a claimant failed to obtain the required permit by January 1, 1990, the claimant would be ineligible for the Fund even though the claim was filed in 1994 or later."

The Board rejected plaintiff's argument that the statute only required current permit compliance, not continuous compliance from January 1, 1990, to the present. In so doing, the Board suggested that plaintiff's interpretation would make subdivision (d)(3)(B) surplusage.

The Board also rejected plaintiff's argument that it was estopped from denying the claim because the Board used financial responsibility forms which used language suggesting current compliance was sufficient.

Plaintiff sought a writ of mandate in the trial court to set aside the Board's determination of ineligibility. The trial court denied the petition in a written order.

The court accepted the Board's interpretation of section 25299.57(d)(3). The court found that plaintiff's interpretation, requiring only current compliance at the time of the claim and not continuous compliance from January 1, 1990, to the present, "would render [subdivision] (d)(3)(B) superfluous." "There would be no need for [subdivision] (d)(3)(B) to discuss whether a waiver was available for claimants who did not obtain permits by January 1,

---

[6] The claim was initially denied at lower administrative levels, and the denial was upheld by the Board in a lengthy decision. For the sake of simplicity we refer to the Board as the decision maker on the claim.

1990 if eligibility could be achieved simply by obtaining permits at any time prior to filing a claim with the Fund."

The court did find that plaintiff had proved a case for equitable estoppel, but ruled that estoppel could not lie to force an agency to do an act that was not authorized—here, to grant eligibility prohibited by section 25299.57(d)(3) as interpreted by the Board and by the trial court.

## III. DISCUSSION

Plaintiff contends that the phrase "has complied" in subdivision (d)(3)(A) means that a claimant against the Fund must be in permit compliance at the time a leak is discovered or at the time he makes the claim, and that noncompliance in the distant past is not determinative of eligibility. As we construe a complicated statute, we are of the view that both plaintiff and the Board adhere to overly simplistic views of the statutory language.

We review *de novo* a question of statutory interpretation. (*Argaman v. Ratan* (1999) 73 Cal.App.4th 1173, 1176 [86 Cal.Rptr.2d 917].) The Board acknowledges our standard of independent review, and correctly notes that we must accord some respect to its interpretation of a statute it is charged to enforce. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11–12 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) We do not accord the Board's interpretation controlling weight, but weight commensurate with such factors as the validity, thoroughness, and consistency of the Board's reasoning underlying its statutory interpretation. (See *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1195 [13 Cal.Rptr.3d 630].) But the interpretation is ultimately subject to our independent review. (*Yamaha, supra,* at p. 12.) An administrative construction of a statute cannot prevail when a contrary legislative purpose is apparent, or if an alternative reading is compelled by the plain language of the provision. (*Stolman v. City of Los Angeles* (2003) 114 Cal.App.4th 916, 930 [8 Cal.Rptr.3d 178].)

 "The fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citation.]" (*O'Kane v. Irvine* (1996) 47 Cal.App.4th 207, 211 [54 Cal.Rptr.2d 549].) "To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning. [Citations.]" (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) Where the statutory wording is clear a court

"should not add to or alter [it] to accomplish a purpose that does not appear on the face of the statute or from its legislative history." (*O'Kane, supra,* at p. 211.) Furthermore, statutory language must be viewed in context, " 'keeping in mind the nature and obvious purpose of the statute where they appear.' " (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224], quoting *Johnstone v. Richardson* (1951) 103 Cal.App.2d 41, 46 [229 P.2d 9].)

The purpose of the Fund is to provide reimbursement for claimants too impecunious to obtain insurance coverage for cleanup costs of leaks or spills—provided those claimants meet the three-pronged test for eligibility set forth in section 25299.57(d). The third prong involves permit compliance. Subdivision (d)(3)(A) requires that the claimant "has complied" with the permit requirement. Subdivision (d)(3)(B) qualifies the compliance requirement for persons such as plaintiff, who filed a claim after January 1, 1994, but did not have a permit by January 1, 1990.

Because of subdivision (d)(3)(B), we cannot accept plaintiff's contention that "has complied" simply means "has complied at the time of the leak or the claim," regardless of when the claim is made and the permit compliance status of the claimant prior to January 1, 1990. Likewise, we cannot accept the Board's grammatical analysis based on the present perfect tense. The Board seems to read the phrase "has complied" as "has *always* complied." The Board appears to take the view that any permit noncompliance prior to January 1, 1990, will forever after preclude a claim, despite years of subsequent permit compliance and the claimant's payment into the Fund of thousands of dollars.

Moreover, the Fund is intended to be an "insurance pool" to reimburse qualified owners who have paid their fees, which are analogous to an insurance premium. Given the remedial purpose of the statute, we should not accept a construction which penalizes a permitted UST owner for bygone conduct. Under the Board's interpretation, it has accepted eight years' worth of fees from plaintiff and now takes the position that he not only is not eligible for the Fund—*but he never was.* We do not believe this is a reasonable interpretation of the statutory language, especially given the legislative intent to provide a reimbursement fund for UST owners and operators who have proper permits for their tanks.

■ In consonance with the legislative history that we explain below, we construe subdivision (d) of section 25299.57 to follow a centrist statutory path between the two polarized interpretations of the parties. Subdivision

(d)(3)(A) imposes a general requirement of permit compliance as a condition of claim eligibility. But that requirement is qualified by subdivision (d)(3)(B), which applies to a specific subset of Fund claimants: as here pertinent, those claimants who (1) did not have a permit required prior to January 1, 1990, and (2) submit a claim on or after January 1, 1994. Subdivision (d)(3)(B) provides that such claimants are subject to subdivision (d)(3)(A)—i.e., pre-1990 permit compliance—but may obtain relief from that requirement—i.e., a permit waiver—if they can establish that they were unaware of the compliance requirement prior to January 1, 1990, and that they otherwise qualify for a waiver under subdivision (d)(3)(B)(i), (ii), and (iii).

This interpretation is supported by legislative history. Subdivision (d)(3)(B) is a "fix-it" measure, added years after the Act's first enactment, to remedy problems encountered in the first years of the law. Subdivision (d)(3)(B) was not enacted until late 1993. The first versions of the Act did *not* contain the language of subdivision (d)(3)(B). Neither the original 1989 version of the Act, nor amended versions of 1990 and 1992, contained the subdivision (d)(3)(B) language. (Stats. 1989, ch. 1442, § 5, pp. 6419, 6427–6428; Stats. 1990, ch. 1366, § 21, pp. 6141–6142; Stats. 1992, ch. 679, § 1, pp. 2909–2910.)

The subdivision (d)(3)(B) language was added to section 25299.57 by Assembly Bill No. 1061 (1993–1994 Reg. Sess.) in 1993, as urgency legislation, and became effective on September 24 of that year. (Stats. 1993, ch. 432, § 6, pp. 2442–2443; see 40F West's Ann. Code (2006 ed.) foll. § 25299.57, p. 55.) Subdivision (d)(3)(B) was enacted to provide for a scheme for permit waivers in the early years of the law, because of a lack of knowledge of the permit requirements for Fund eligibility under the new law or difficulties in obtaining permits. Permitting procedures differed from county to county. Many UST owners either did not know they needed a permit or did not know how to obtain one. Subdivision (d)(3)(B) was enacted to allow owners who did not have a permit by January 1, 1990, to make a claim against the Fund by receiving a waiver of the pre-1990 permit requirement, obtaining a permit, and paying back taxes and fees. (Sen. Com. on Toxics & Public Safety Management, Analysis of Assem. Bill No. 1061 (1993–1994 Reg. Sess.) as amended July 6, 1993, pp. 1, 5.)

It appears from the Board's own decision in this case that plaintiff may have been unaware of the permit requirement prior to January 1, 1990. It is undisputed that plaintiff had a permit and was current on his fees and taxes at the time he made his claim. Thus, it appears that plaintiff may fall under the

provisions of subdivision (d)(3)(B), and the Board should determine from all of the evidence whether plaintiff is entitled to a permit waiver to render him eligible for a claim against the Fund.

We make an additional observation. In its order denying plaintiff relief, the Board appeared to take the position that subdivision (d)(3)(B) applies to permits required by January 1, 1990, but not permits required after that date. The Board reasoned that since plaintiff was unpermitted between January 1, 1990, and December 1994, he could not obtain a permit waiver for that period of time and thus cannot receive a waiver now to allow his claim. This interpretation is not a reasonable one in light of the text of the statute and the legislative history and intent. Plaintiff may state a claim providing he obtains a waiver for the pre-1990 noncompliance and otherwise satisfies the provisions of subdivision (d)(3)(B).[7]

Plaintiff is entitled to be considered for a permit waiver under subdivision (d)(3)(B) with regard to his claim against the Fund. The trial court should have granted the mandate petition against the Board for the limited purpose of proceeding to consider a permit waiver.[8]

At oral argument, the Board suggested that plaintiff has waived any right to obtain a permit waiver, apparently on the premise that he did not pursue one below. But the administrative record shows that plaintiff did request a permit waiver at lower administrative levels within the Board, and that request was denied. The Board's own decision shows that plaintiff was denied a permit waiver. While there was some confusion among the parties about whether waivers only applied to the period before January 1, 1990, a position we have rejected in this opinion, plaintiff's inability to obtain a permit waiver stems directly from the Board's ongoing, and erroneous, contention that plaintiff had to be in continuous compliance with the permit requirement to obtain relief from the Fund.

---

[7] The Board's interpretation is also inconsistent with its own administrative regulation. California Code of Regulations, title 23, section 2811, defines Fund eligibility and tracks section 25299.57(d). The regulation states:

"If the [UST] . . . that is the subject of the claim was installed before January 1, 1990, and the claimant owned or operated the tank before January 1, 1990, the claimant must have obtained any permit required by Health and Safety Code, division 20, chapter 6.7 [which includes section 25284], or filed a substantially complete application for any required permit on or before January 1, 1990. If the claimant did not obtain or file for a permit required by . . . section 25284 on or before January 1, 1990, then the claimant may seek a waiver of the requirement to obtain a permit . . . ." (Cal. Code Regs., tit 23, § 2811, subd. (a)(2)(B).)

Nothing in this regulation speaks to an interim unpermitted period between January 1, 1990, and the seeking of a waiver for a claim made after January 1, 1994.

[8] We stress that our ruling is limited to the particular facts of this case, in which a UST owner paid thousands of dollars into the Fund over a period of substantial compliance—from 1994 onward—and was then told he is ineligible for Fund reimbursement because he did not have a permit prior to January 1, 1990. Other factual scenarios are not before us.

## IV. DISPOSITION

The order denying the petition for writ of mandate is reversed. The cause is remanded to the trial court with directions to grant the petition for the limited purpose of determining whether plaintiff satisfies the requirements for a permit waiver, consistent with the discussion in this opinion.[9]

Stein, J., and Swager, J., concurred.

A petition for a rehearing was denied August 17, 2007, and the opinion was modified to read as printed above.

---

[9] In light of this conclusion, we need not reach plaintiff's remaining contentions. In particular, because we do not reach the issue of estoppel we need not consider the impact on this case, if any, of *Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346 [56 Cal.Rptr.3d 591].