Filed 4/16/24 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| APEX SOLUTIONS, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> FALLS LAKE INSURANCE MANAGEMENT COMPANY, INC., <br><br> Defendant and Appellant. | A167491 <br><br> (Alameda County Super. Ct. No. RG21099709) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

BY THE COURT:

The court orders that the opinion filed in this appeal on March 28, 2024, be modified as follows:

1. In footnote 5 which begins on page 5 and continues on page 6, in the first sentence add the words "was erroneous" to the end of the sentence so that it reads:

   Nothing in Apex's opening brief addresses whether the trial court's ruling on the second cause of action for breach of the implied covenant of good faith and fair dealing was erroneous.

2. On page 19, in the last paragraph add the words "on June 2" after the words "police report" to the first sentence so that it reads:

1

The middle-of-the-night setting suggests only one plausible scenario: Based on the narrative in the police report on June 2—which describes a group of people being directed by a leader, responding to directions, and working together—this was a coordinated raid by a group of unknown persons, working on a single heist, which is what Apex initially reported to the police.

3. On page 27, in the paragraph that continues from page 26 (which begins with "Faced with these diametrically opposed positions") add the following sentence to the end of the paragraph so that the last two sentences of the paragraph read:

But inadmissibility was not the basis of the trial court's ruling. The basis of the court's ruling was that "[Apex] has failed to demonstrate that the method" used for calculating annual net income used by Falls Lake "is not in compliance with the policy's provisions," which would be true only if Wahl's opinion were accepted over Funderburke's.

The modifications effect no change in the judgment.

Appellant's petition for rehearing is denied.

Dated: _____          _____ P. J.
                                                            J. Brown

Trial Court:   Superior Court of California, County of Alameda

Trial Judge:  Hon. Tara Desautels

Counsel:        Williams & Gumbiner, Joel P. Gumbiner and Bartlett H.
                    Williams for Plaintiff and Appellant.

                    Hinshaw & Culbertson, Maria S. Quintero for Defendant and
                    Respondent.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| APEX SOLUTIONS, INC.,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>FALLS LAKE INSURANCE MANAGEMENT COMPANY, INC.,<br><br>Defendant and Respondent. | A167491<br><br>(Alameda County Super. Ct.<br>No. RG21099709) |

In this insurance coverage case, we are called upon to review a judgment entered for the insurer, Falls Lake National Insurance Company (Falls Lake), following a ruling on cross-motions under Code of Civil Procedure section 437c.[1]

The appellant, Apex Solutions, Inc. (Apex), runs a cannabis business in Oakland. Apex sustained property and business income losses when unknown burglars broke into its facility in June 2020 and emptied the contents of two vaults containing cannabis inventory. It presented claims for loss of over $2.5 million to Falls Lake, and this litigation ensued when the parties could not agree on the amount of loss owing under Falls Lake's policy.

The principal issue for decision is whether Apex's property insurance claim for stolen inventory is subject to a single per occurrence limit of

---

[1] All undesignated statutory references are to the Code of Civil Procedure.

$600,000, as Falls Lake contends, or two per occurrence limits totaling $1.2 million, as Apex contends. We must also address whether Falls Lake owes some $154,000 in additional payments and reimbursements on Apex's business interruption claim.

On the first issue, we conclude the trial court correctly ruled that a single per occurrence limit applies. On the second, we conclude that, in granting summary judgment for Falls Lake, the court overlooked a disputed issue of material fact concerning proper calculation of Apex's claim of lost business income.

We will reverse the judgment in part, remand on one narrow aspect of the claim for lost business income, and otherwise affirm.

## I. BACKGROUND

In the early summer of 2020, the mayor of Oakland declared a municipal state of emergency, citing conditions of extreme peril to the safety of persons and property within the city. The declaration came in the wake of "unrest and violence . . . in Oakland and other cities in the Bay Area and around the country" following the murder of George Floyd. Among these emergency conditions was the looting of businesses.

Apex, which describes itself as the owner of a business that "manufactures, stores and distributes cannabis and cannabis related products and merchandise," operates out of a facility at 8435 Baldwin Street in Oakland. In the early morning hours of June 1, 2020, a group of unidentified burglars broke into Apex's facility and stole a large portion of its cannabis inventory. The thieves raided two separate inventory vaults on Apex's premises, one called the Distro Vault, and one called Kate's Vault.

The following day, Apex submitted a police report. In its report, Apex described a break-in at its facility and theft of inventory in the middle of the

night.  Apex stated the incident started on "06/01/2020 01:30 AM" and ended on "06/01/2020 5:00 AM".  On Apex's security surveillance video recording, the perpetrators' activities can be clearly seen, but they wore masks and could not be identified.  No one was ever apprehended or charged in connection with the burglary.

The narrative in Apex's police report reads as follows:  "On 6/1/20 at around 1:30am, our business at 8435 Baldwin St in Oakland was broken into and burglarized.  There was a large group that congregated in front of our building, and through the audio of the surveillance footage, you can hear one male directing the rest of the group to grab crowbars to pry open the front door as well as giving them direction on how to.  The group then proceeded to storm the building and dispersed into separate rooms to each steal from one part of the building.  This seemed like a coordinated attack from a gang, as everyone was on the same page and cooperating with each other."

Several months later, on October 27, 2020, Apex submitted a supplemental police report updating its original narrative of the June 1 break-in and theft of its inventory.  In the October 27 supplemental police report, Apex claimed the time-stamps showed two different groups of burglars entering and leaving independently of one another, and two separate and sequential breaches, first of the Distro Vault, and then, after a break in time of nearly an hour, of Kate's Vault.  According to Apex, these two groups of burglars entered its premises, respectively, at 1:45 a.m. and 2:57 a.m.

Apex was insured against this kind of loss.  Falls Lake issued a commercial package policy to Apex, effective from March 26, 2020 to March 26, 2021 (the Policy).  Apex is the named insured and the insured premises is Apex's Baldwin Street location.  The Policy includes a series of Special Forms

6

providing various types of coverage, including Commercial General Liability Coverage (CGL Coverage); Commercial Property Coverage (Property Coverage); and Business Income (and Extra Expense) Coverage (Lost Business Income Coverage).[2] The Property Coverage affords coverage for any loss of "Cannabis Inventory" up to a $600,000 per occurrence" limit, and the Lost Business Income Coverage affords coverage for lost income due to business interruption up to a $2 million limit.[3]

On June 2, 2020, the same day Apex initially reported the night raid and theft of its inventory to the police, Apex submitted a claim to Falls Lake reporting a covered loss under the Property Coverage and the Lost Business Income Coverage. The preliminary proof of loss, submitted by Apex's adjuster a few weeks later, stated, "we have prepared a preliminary loss measure which reflects the cumulative total of each of the burglary occurrences. Given a cannabis inventory value in the amount of $2,535,278 against an occurrence policy limit of $600,000, [we] see no reason why the total occurrence limit cannot be paid."

Falls Lake reserved its rights on the per occurrence limit issue, while taking the position that only a single limit applied. On August 4, 2020, it paid $600,000 for the claimed cannabis inventory loss. Its adjuster explained, "we have conducted a preliminary evaluation and reviewed the police report and records you have provided us. . . . Based on our preliminary

---

[2] These Special Forms fall into two groups, the CGL Part and the Property Part. Premiums were calculated separately for the CGL Part and the Property Part.

[3] A "coinsurance" provision in Section D of the Lost Business Income Coverage reduced Apex's loss recovery as a penalty for failing to purchase insurance with limits equivalent to at least 80 percent of the value of the covered property.

evaluation, it appears only one occurrence applies to this loss." Eventually, Falls Lake paid another $673,477 of Apex's claimed loss under the Lost Business Income Coverage. Apex took the position it was owed an additional $64,138 under the Lost Business Income Coverage based on projected future customer sales, as well as reimbursement for an additional $89,700 in extra expenses incurred to avoid future losses.

When the parties were unable to resolve their differences in the adjustment process, Apex filed a complaint in Alameda County Superior Court against Falls Lake (erroneously sued as Falls Lake Insurance Management Company Inc.); CannGen Insurance Services, LLC; and Fidens International LLC dba Fidens Insurance Brokerage, LLC.[4] Against Falls Lake, the complaint alleged causes of action for breach of contract and for breach of the implied covenant.

The parties brought cross-motions under section 437c directed to both causes of action, with Falls Lake seeking summary judgment or in the alternative summary adjudication, and Apex seeking only summary adjudication. On December 2, 2022, the court issued an order granting Falls Lake's motion and denying Apex's motion. The court later entered judgment for Falls Lake pursuant to the order disposing of these motions. This timely appeal from the judgment followed.

## II. DISCUSSION

We address two issues in this appeal, both of them claims of error in the trial court's section 437c ruling for Falls Lake on the first cause of action

---

[4] Fidens is no longer party to this litigation, having settled the claims against it separately.

8

for breach of contract.[5]  Specifically, those issues are: (1) Does Apex's claim of loss for the theft of its cannabis inventory involve one occurrence, or two occurrences, for purposes of the per occurrence limit in the Property Coverage?  And (2) is Apex entitled to additional payment for lost business income or for extra expense reimbursement on its claim of loss under the Lost Business Income Coverage?

On the first issue, the parties agree the facts are undisputed, but draw different legal conclusions from those facts, with Apex taking the position we should not only reverse but instruct that summary adjudication be rendered in its favor.  On the second issue, Apex claims there is a material dispute of fact that must be tried.

Our analysis is governed by familiar principles.  If, on a motion for summary judgment or summary adjudication, "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," then a grant of the motion is warranted.  (§ 437c, subd. (c); see *Aguilar v. Atlantic Richfield Co.* (2001)

---

[5] Nothing in Apex's opening brief addresses whether the trial court's ruling on the second cause of action for breach of the implied covenant of good faith and fair dealing.  Having failed to address that aspect of the court's ruling in its opening brief, Apex has forfeited any such claim of error. (*Katelaris v. County of Orange* (2001) 92 Cal.App.4th 1211, 1216, fn. 4.)  In its reply brief, Apex contends the court's adverse ruling on its second cause of action remains a live issue because its notice of appeal embraces the entire judgment and all rulings preceding entry of judgment, and for the first time offers argument going to the implied covenant cause of action.  It misses the point.  Appeals, once noticed, do not brief themselves.  And in the briefing process, all issues for decision must be properly addressed in the opening brief.  (Cal. Rules of Court, rule 8.204(a)(1)(B).)  Argument presented for the first time in reply will generally "not be entertained because of the unfairness to the other party."  (*People v. Tully* (2012) 54 Cal.4th 952, 1075.)  We see no reason to depart from the general rule here.

25 Cal.4th 826 (*Aguilar*).) "We independently review the parties' papers supporting and opposing the motion, using the same method of analysis as the trial court. Essentially, we assume the role of the trial court and apply the same rules and standards." (*Kline v. Turner* (2001) 87 Cal.App.4th 1369, 1373.)

Under *Aguilar*, the movant initially carries the burden of making a prima facie showing in its favor. (§ 437c, subd. (p)(1); see *Aguilar*, *supra*, 25 Cal.4th at p. 849.) "The prima facie showing by the moving party must be such that it would, if uncontradicted, entitle the moving party to judgment as a matter of law. [Citation.] That is, 'a moving defendant must present evidence which, if uncontradicted, would constitute a preponderance of evidence [i.e., show it is more likely than not] that an essential element of the plaintiff's case cannot be established.' " (*Leyva v. Garcia* (2018) 20 Cal.App.5th 1095, 1101 (*Leyva*).) Upon an adequate prima facie showing by the movant, "the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid.*)

Upon a showing that "one or more elements of the cause of action cannot be established," the burden shifts to the non-movant to "demonstrate a triable issue of material fact exists." (*We Do Graphics, Inc. v. Mercury Casualty Co.* (2004) 124 Cal.App.4th 131, 135; § 437c, subd. (p)(2).) "In evaluating whether there is a triable issue of material fact, we must view the evidence in the light most favorable to the opposing party by 'strictly constru[ing]' the evidence of the moving party, 'liberally constru[ing]' that of the opposing party, and resolving any doubts against summary judgment." (*McHenry v. Asylum Entertainment Delaware, LLC* (2020) 46 Cal.App.5th 469, 479.) But because speculation is not evidence (*Aguilar*, *supra*,

25 Cal.4th at p. 864), "speculation cannot create a triable issue of material fact." (*McHenry,* at p. 479; accord, *Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1453 ["A triable issue of fact can only be created by a conflict of evidence, not speculation or conjecture."].)

Should we be satisfied that the facts are undisputed, our review of the trial court's application of substantive law proceeds without deference. (*Terrell v. State Farm General Ins. Co.* (2019) 40 Cal.App.5th 497, 502; *Mercury Casualty Co. v. Chu* (2014) 229 Cal.App.4th 1432, 1443.) We review the result the trial court reached, not its legal reasoning, and we may affirm on any ground supported by the record, unconstrained by the route the trial court took in getting there. (*The Pep Boys Manny Moe & Jack of California v. Old Republic Insurance Company* (2023) 98 Cal.App.5th 329, 334 (*Pep Boys*).)

We undertake our review in this case against the backdrop of a set of well-known principles governing interpretation of insurance contracts. While these contracts " ' " 'have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' [Citations.] 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' " ' " (*Pep Boys*, *supra*, 98 Cal.App.5th at p. 335.) Contracting intent " ' " 'is to be inferred, if possible, solely from the written provisions of the contract.' [Citation.] 'If contractual language is clear and explicit, it governs.' [Citation.]" ' " (*Ibid*.)

"[S]tandard form policy provisions are interpreted under the same rules of construction. ' "[W]hen they are examined solely on a form, i.e., apart from any actual agreement between a given insurer and a given insured, the rules stated above apply *mutatis mutandis*. That is to say, where it is clear, the language must be read accordingly, and where it is not, in the sense that satisfies the hypothetical insured's objectively reasonable expectations." ' "

(*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 391 (*Powerine Oil*), quoting *Buss v. Superior Court* (1997) 16 Cal.4th 35, 45.)

## A. *The Single Occurrence Versus Multiple Occurrences Issue*

### 1. The Absence of a Special Definition in the Property Coverage for the Term "Occurrence"

Turning to the first issue presented, we begin with the text of the Policy. The first-party Property Coverage, Section A, states that "We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations"—a metal building at 8435 Baldwin Street, Oakland—"caused by or resulting from any covered cause of loss." It is undisputed that "direct physical loss" encompasses physical displacement or loss of physical possession," including loss by theft. (See *EOTT Energy Corp. v. Storebrand International Insurance Co.* (1996) 45 Cal.App.4th 565, 569 (*EOTT*) [coverage against " 'all risks of direct physical loss or damage' " includes theft losses].)

"Covered Property" includes "Business Personal Property," which in turn includes "Stock," a term defined to mean "merchandise held in storage or for sale." At issue in this case is the policy limit applicable to claims for loss of "Cannabis Inventory," a specific kind of Stock under one of the Special Forms that comprise the Property Coverage.[6] "The most we will pay for loss

---

[6] In the Additional Exclusions & Endorsements Cannabis and Hemp Business Property Form, there is a warranty clause in which Apex warrants that "all inventory and/or stock of marijuana and marijuana containing items is kept locked in a safe or a vault room at all times during business and non-business hours." Under this clause, Apex "further warrant[s] that any safe" weighing between "800 and 2,000 pounds" that is "used to house all marijuana stock and/or inventory will be bolted to the ground." Only safes weighing above 2,000 pounds are exempt from this requirement. The Policy also includes a Special Form defining and establishing conditions for a "Vault," including that each vault must be a "Steel container [that] is 100%

12

or damage in any one occurrence," the Policy provides, "is the applicable Limit Of Insurance." The Declarations page, which lists the applicable "Limit of Insurance" for each "Covered Cause of Loss" under the Special Forms, shows a per occurrence limit of $600,000 for "Cannabis Inventory Coverage."

"A 'policy limit' (or 'limit of liability') is the maximum amount the insurer is obligated to pay in contract benefits on a covered loss." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2023) ¶ 3.64) (Croskey et al. Insurance Litigation); see *George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1128–1129.) The question we address here focuses on the meaning of the term "occurrence" for purposes of the policy limit in the Property Coverage. As briefed by the parties, a central issue in this appeal is that the Property Coverage section of the Policy, which is set forth in one of the first-party Special Forms, does not define the term "occurrence."

Apex argues that, according to the dictionary, the word "occurrence," when used "in the singular," means "something that happens[,] event [or] incident." Applying that plain English meaning to the facts presented, Apex contends there were two separate "occurrences" because the surveillance video and time-stamps show breaches of the Distro Vault and Kate's Vault by different people at different points in time, separated by nearly an hour. Because each breach could have been charged and punished as a separate crime, Apex contends, it is entitled to payment capped by the combination of two separate $600,000 per occurrence limits.

---

enclosed," must have walls made of "a minimum of 14-gauge steel," must be in a locked room monitored by "[v]ideo surveillance with continuous 24-hour recording," and must be "in a building equipped with . . . central station burglar alarm."

In making this argument, Apex leans heavily on the fact that, in the third-party CGL Coverage Form, Falls Lake included a special definition of the term "Occurrence." In the CGL Coverage, Apex points out, that defined term—spelled with an initial capital letter "O"—means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Without this special definition, Apex contends Falls Lake must have known the term would naturally be understood by a reasonable insured to mean a single event, in the plain English sense. (See *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 ["If there is ambiguity [in an insurance contract] . . . it is resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation."].)

It is not necessary to resort to the dictionary to understand what the word "occurrence" means for purposes of the Property Coverage policy limit. In the field of insurance, "occurrence" is generally defined to mean an "accident" (*Safeco Ins. Co. of America v. Fireman's Fund Ins. Co.* (2007) 148 Cal.App.4th 620, 632 (*Safeco*)), which connotes the element of fortuity that is essential to all insurance (*Chu v. Canadian Indemnity Co.* (1990) 224 Cal.App.3d 86, 95). Understood in that sense, the word can give rise to timing questions about whether coverage is "triggered" during a policy term. (See e.g., *Whittaker Corp. v. Allianz Underwriters, Inc.* (1992) 11 Cal.App.4th 1236, 1243.) Since some accidents happen all at once, and some happen incrementally over time, pinpointing an "occurrence" in time can be critical to whether there is coverage at all.

To address these often difficult questions of timing, it is not uncommon to see special definitions of "occurrence" in insurance policies, especially

14

third-party liability policies.[7]  The special definition in the Liability Coverage Form—which defines an "Occurrence" to mean "an accident, including continuous or repeated exposure to the substantially the same general harmful conditions"—is typical.  In the trial court, the parties debated extensively whether this special definition sheds any light on the meaning of the undefined term "occurrence" in the Property Coverage, and they continue that debate here on appeal.  We do not think it does.

The term "occurrence" in the Property Coverage addresses "the amount of coverage," not whether there is coverage at all.  (See *Safeco, supra*, 148 Cal.App.4th at p. 632.)  We are not persuaded that the absence of a special definition creates ambiguity (*Powerine Oil, supra*, 37 Cal.4th at p. 390; see *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 866–867), and without an ambiguity, it is unnecessary to resort to tiebreaking rules calling for broad reading of insurance contract language to favor the reasonable expectations of the insured (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321); see *Yahoo Inc. v. National Union Fire Ins. Co. etc.* (2022) 14 Cal.5th 58, 67).

The trial court correctly observed that when words in an insurance contract have been given a technical or special meaning, they must be understood against the backdrop of that established meaning.  (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 288; see Civ. Code § 1645.)  But our analysis turns on a more specific version of this

___

[7] See e.g. *Safeco, supra,*148 Cal.App.4th at pp. 630–631; *American Internat. Bank v. Fidelity & Deposit Co.* (1996) 49 Cal.App.4th 1558, 1565; *Century Indem. Co. v. Hearrean* (2002) 98 Cal.App.4th 734, 738; *Tidwell Enterprises, Inc. v. Financial Pacific Ins. Co., Inc.* (2016) 6 Cal.App.5th 100, 103; *Standard Fire Ins. Co. v. Spectrum Community Assn.* (2006) 141 Cal.App.4th 1117, 1124–1125; *State Farm General Ins. Co. v. JT's Frames, Inc.* (2010) 181 Cal.App.4th 429, 449–450.

principle. Where an undefined "policy term has been judicially construed, it is not ambiguous. [Citation.] '[T]he judicial construction of the term should be read into the policy unless the parties express a contrary intent.' [Citations]." (*McMillin Homes Construction, Inc. v. National Fire & Marine Ins. Co.* (2019) 35 Cal.App.5th 1042, 1052–1053; see *Norris v. Pacific Indemnity Co.* (1952) 39 Cal.2d 420, 424 [provisions "should be given a meaning settled by judicial decision"].) Although "[t]his rule is applied ' "with caution, first determining whether the context in which the construed term is analogous" ' " (*McMillin Homes,* at pp. 1052–1053), we think it naturally applies here.

Contextually, the key to interpreting the per occurrence clauses at issue here is their "intended function in the policy." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265.) When used to establish policy limits and policy deductibles, the term "occurrence" has long had a settled meaning. (See *EOTT, supra*, 45 Cal.App.4th 565; *B.H.D., Inc. v. Nippon Ins. Co.* (1996) 46 Cal.App.4th 1137 (*B.H.D.*); *Lexington Ins. Co. v. Travelers Indem. Co. of Ill.* (9th Cir. 2001) 21 Fed.Appx. 585 (*Lexington*); *Patterson v. American Economy Ins. Co.* (9th Cir. 2018) 710 Fed.Appx.762; see also Croskey et al. Insurance Litigation, *supra*, ¶ 7.369.) In this specific context, courts generally hold that the term " 'occurrence . . . mean[s] the underlying cause of the injury, rather than the injury or claim itself.' " (*Safeco, supra*, 148 Cal.App.4th at p. 633 [third-party insurance], italics omitted; *EOTT, supra*, 45 Cal.App.4th at p. 576 [first-party insurance].).

In California law, the leading first-party insurance case in this line of precedent is *EOTT*, a case involving a deductible dispute. At issue there was a $100,000 per occurrence deductible as it applied to a claimed loss of $1.5 million under an all-risk property insurance policy covering theft. (*EOTT,*

16

*supra*, 45 Cal.App.4th at p. 568.)  The insured suffered the loss from the theft of diesel fuel by truckers who filled their tanks at a storage depot free of charge by overriding the depot's debiting system.  (*Id*. at pp. 569–570.)  Over the course of an 11-month period, there were 653 such pumping incidents. (*Id*. at p. 570.)  The insured claimed that the multiple thefts were "in reality an integral part of a longstanding, organized conspiracy which resulted in a systematic theft of its oil products and thus amounted to only one occurrence to which a single deductible should be applied."  (*Id*. at p. 568.)  The insurer, on the other hand, claimed "each of the 653 thefts should be regarded as separately subject to the policy's $100,000 deductible."  (*Id*. at p. 571.)  On cross-motions for summary judgment, the trial court ruled for the insurer. (*Ibid*.).

The appellate panel reversed and remanded for trial, determining that the insured presented enough evidence of coordinated activity to justify a trial on the insured's theory that the cause of its loss was a single conspiracy. (*EOTT*, *supra*, 45 Cal.App.4th at p. 578 ["this record discloses that evidence was presented by EOTT which demonstrates that material issues of fact exist on that point"].)  The *EOTT* court adopted a causation-based interpretation of "occurrence."  After surveying precedent nationwide, Justice Croskey, writing for the panel, found that "[a] number of cases which have considered the question of whether a series of acts constituted a single occurrence or multiple occurrences have looked to the *cause* of the loss."  (*Id.* at pp. 575–576.)[8]

---

[8] This remains the generally accepted view across the country today. (See 10A Couch on Insurance (3d. ed. 2023) § 148:57 ["Generally, absent a policy provision to the contrary, it is required that a loss be proximately caused by an insured risk or cause."]; Windt, Insurance Claims and Disputes

17

Applying the causation-of-loss approach, The *EOTT* court interpreted the undefined "term 'occurrence' 'in context, with regard to its intended function in the policy. [Citation.]' [Citation.] As used in the policy, the term 'occurrence' reasonably contemplates that multiple claims could, in at least some circumstances, be treated as a single occurrence or loss." (*EOTT*, *supra*, 45 Cal.App.4th at p. 575.) "In our view," the court concluded, "EOTT's objectively reasonable expectation would embrace the conclusion that multiple claims, all due to the same cause or a related cause, would be considered a single loss to which a single deductible would apply." (*Ibid*.)

A series of cases decided under California law in the years since *EOTT* applies the same analysis. Of these cases, two—*B.H.D., supra*, 46 Cal.App.4th 1137, and *Lexington*, *supra*, 21 Fed.Appx. 585—garner the most attention in the parties' briefs. In *B.H.D.*, "[a] person posing as a customer stole items of jewelry from the insured" (*B.H.D.*, at p. 1139), a jewelry store, "during each of many visits over a three-month period" (*ibid.*), and the insured then made a claim under a casualty policy covering losses for theft. "The aggregate amount of the [claimed] thefts exceeded the $10,000 deductible limit, but that limit was not exceeded by the theft on any one occasion. There was no extrinsic evidence with respect to the meaning of the policy terms. The trial court held that the deductible was not exceeded and, therefore, the insurer was not liable to the insured." *(Ibid.)*

The appellate court affirmed. It pointed out that the insured conceded the serial thefts involved were carried out by a single person on separate occasions, each of which was a "completed crime that would have supported a

(6th ed. 2024) § 11:24 ["The vast majority of courts have held, in the absence of policy language to the contrary, that the number of occurrences is determined by referring to the cause or causes of damage, rather than to the number of individual claims or injuries."].)

separate count in a criminal proceeding." (*B.H.D., supra*, 46 Cal.App.4th at p. 1142.) But ultimately the "central distinction . . . [wa]s the difference in the policy language. Rather than a provision that suggests aggregation of all thefts into a single claim ('all claims . . . arising out of any one occurrence . . . shall be adjusted as one claim'), the policy in this case specifically applied the deductible to each loss 'separately occurring.' There was no comparable provision in *EOTT*." (*Id.* at p. 1143.)

*Lexington* involved a dispute between an excess insurer, Lexington, and a group of primary insurers over a claim for loss incurred by the insured, the County of Contra Costa, for multiple fires set by an arsonist at multiple courthouses. "The first fire occurred on August 28, 1995 at the Walnut Creek Municipal Court in Walnut Creek. The other three fires occurred seventeen days later on September 14, 1995. The first of the September 14th fires occurred at the Traffic and Small Claims Court in Concord. The second fire occurred six minutes later at the nearby Mount Diablo Municipal Court in Concord. The final fire was ignited less than one hour later at the Contra Costa Superior Court located in Martinez. The fires were individually started by Richard Dudley Stevens, who had apparently suffered several adverse rulings in all of the courthouses involved. Stevens was charged and convicted on separate counts of arson." (*Lexington*, *supra*, 21 Fed.Appx. at p. 587.)

Collectively, the courthouse fires in *Lexington* caused $14 million in damage, but the damage resulting from only one of the fires exceeded the $5 million per occurrence limit in the primary insurers' policies. (*Lexington*, *supra*, 21 Fed.Appx. at p. 587.) If, as the primary insurers contended, the fires constituted a single "occurrence" under their policies, then Lexington would be liable under its excess policy for $7.5 million of the total loss. If, on

19

the other hand, as Lexington contended, each of the fires constituted a single "occurrence," then the primary insurers were liable for the entire loss in the form of multiple claims subject to multiple per occurrence limits. The trial court ruled for Lexington, and a Ninth Circuit panel affirmed, explaining, "We agree with the district court that four separate fires in four separate buildings at four separate locations constitute four separate occurrences for purposes of plaintiffs' liability and the policy deductible." (*Id*. at p. 590.)

There was no evidence of a common plan or conspiracy in *Lexington* and, as in *B.H.D*, the Ninth Circuit panel emphasized policy language distinguishing the case before it from *EOTT*. As the panel explained, "[t]he deductible provision in this case . . . contained an additional qualification not found in *EOTT*. The deductible provision stated that a single deductible applied to claims resulting from a single occurrence, with the reinstatement clause creating an exception only for earthquake and flood: According to the '72-hour provision,' in the event of damages from either earthquake or flood, plaintiffs were allowed to aggregate losses within a 72-hour period as one occurrence. [¶] . . . Plaintiffs' argument that they should be allowed to aggregate the arson fires as is possible with earthquake and flood would render the 72-hour provision superfluous." (*Lexington*, *supra*, 21 Fed.Appx. at pp. 590–591.)

### 2. Application of the Causation of Loss Test

How, exactly, the above-described cases apply on this record presents a more difficult question than one might expect at first blush. Apex relies primarily on *B.H.D.* and *Lexington*, while Falls Lake distinguishes those cases. Falls Lake relies primarily on *EOTT*, while Apex distinguishes it. After considering the parties' competing views of these three cases, we conclude Falls Lake has the better of the argument. Without embracing the

20

entirety of its reading of the law, we agree that *EOTT* dictates affirmance of the trial court's per occurrence ruling.

To begin with, the particular language of the Policy—a point of emphasis in both *B.H.D.* and *Lexington*—tends to bring this case within the holding in *EOTT*, rather than distinguish our facts from it. The insuring agreement, set forth in Section A of the Property Coverage, states, "We will pay for direct physical loss of or damage to Covered Property . . . resulting from any Covered Cause of Loss." And on the Declarations page, the phrase "Covered Causes of Loss" appears on a chart listing each applicable coverage limit under all Special Forms that are included in the Property Coverage Part of Falls Lake's total package of insurance. This causation language, which was not present in either *B.H.D.* or *Lexington*, suggests the parties recognized the per occurrence limits in the Property Coverage would apply to occurrences identified by causes of loss, consistent with established law as enunciated in *EOTT*.

Unlike *B.H.D.* and *Lexington*, moreover, the record does not support a determination that there were separate occurrences at Apex's business premises on June 1, 2020. Here, however, Falls Lake goes too far. It places great emphasis on the state-of-emergency at the time of the loss. In its telling, the loss Apex suffered is attributable to a breakdown in civil order during an unprecedented period of public unrest, a single occurrence. Predictably, that analysis draws withering criticism from Apex. "To carry Falls Lake's argument to its extreme," Apex argues, "consider a hypothetical college campus insured under the Falls Lake Policy. One day arsonists burn a building, then weeks or days (or even an hour) later different people br[eak] into another building on campus and st[eal] property, and then later yet another group vandalize[s] a third building. . . . Falls Lake's interpretation of

21

*EOTT* would allow Falls Lake to call the events 'rampant crime' and thereby reduce them to a single occurrence subject to one Policy limit."

We see no need to analyze what happened here at such a high level of generality. "A difficult question, rarely expressly addressed" in the extant case law "outside of the context of coverage for third party claims, is whether the 'cause' of a loss for the purpose of determining the number of occurrences is the general overarching cause or the more immediate cause." (Windt, Insurance Claims and Disputes, *supra*, § 11:24.) To avoid "what would otherwise potentially be a limitless bundling of injuries into a single occurrence" (*Addison Ins. Co. v. Fay* (2009) 232 Ill.2d 446, 461 [905 N.E.2d 747, 756]), we hold that, to be a single occurrence, the cause of loss must "be so closely linked in time and space as to be deemed by the average person as a single event." (*Doria v. Insurance Co. of North America* (N.J.Super.Ct.App.Div. 1986) 210 N.J.Super. 67, 69 [509 A.2d 220, 221].) This analysis must be undertaken on a case-by-case basis (*Addison*, *supra*, 905 N.E.2d at p. 756; *Doria*, *supra*, 509 A.2d at p. 224), but we are satisfied that what happened in this case meets the test, given the close temporal and spatial proximity of the events in question.

The middle-of-the-night setting suggests only one plausible scenario: Based on the narrative in the police report—which describes a group of people being directed by a leader, responding to directions, and working together—this was a coordinated raid by a group of unknown persons, working on a single heist, which is what Apex initially reported to the police. Given the fortified nature of the vaults involved and their secured locations (see *ante*, fn. 6.), the idea that there were two separate opportunistic, spur-of-the-moment vault breaches is implausible. What happened here was hardly a smash-and-grab operation. According to photo stills and an unrebutted

22

declaration submitted by Falls Lake below, the surveillance video showed that the facility was continuously occupied—if not by exactly the same people, at least by people working in coordinated fashion. Whoever breached the second vault had to come prepared, with tools and a plan for breaking into a locked vault room as well as a vault with walls of at least 14-gauge steel. (See *ante*, fn. 6.) The suspects most likely to have that capability, it seems to us, would be people working in concert with the same group that had successfully breached the first vault less than an hour earlier.

Apex's multiple occurrences interpretation of the facts turns on its view that different people can be identified breaking into Kate's Vault. According to Apex, the security video footage shows a number of unidentified people breaking into multiple rooms, stealing inventory from the Distro Vault, and departing that area of the facility, all between 1:45 a.m. and 2:17 a.m. Then, approximately 40 minutes later, starting at 2:57 a.m., security footage shows different people near Kate's Vault, in a different area of Apex's facility. In support of the separate occurrences inference it asks us to draw from these facts, Apex elected not to proffer the video itself, which would have showed the full sequence of events while these anonymous intruders were doing their work. Instead, it proffered selected still images that do not reveal how exactly the vaults were breached or how events unfolded over time. Based on the still images alone, what happened in the critical 40-minute hiatus between the break-ins is a matter of speculation. It is certainly *possible* that that was simply the time it took the thieves to stow the contraband from the Distro Vault into a getaway vehicle or vehicles before they turned their attention to Kate's Vault. But because the objective circumstances reasonably suggest some degree of coordination, we need not engage in that kind of speculation about what happened between 2:17 a.m. and 2:57 a.m.

The problem for Apex is that, lacking any evidence of an independent burglary crew—either by direct or circumstantial proof—it has no choice but to speculate about the crucial 40-minute gap in time. In the face of a declaration from Kenneth Harris, a member of Falls Lake's adjuster team who stated that "[t]he video footage provided to me by Apex shows continuous activity in and at the Apex facility including near or at the Apex vaults during the period of 1:45 a.m. through 3:30 a.m.," Apex offered nothing to refute his view that there was unbroken activity in the building.[9] Its contention, as noted, was that a wholly different group of people arrived and carried out the second break-in. Granted, it seems *possible* that during the 40-minute hiatus between the two break-ins a distinct group of people happened to be loitering in the vicinity shortly after 2:00 a.m., saw an opportunity to rush into the facility immediately—which, presumably, would account for the fact that activity was continuous—and that this second group also happened to have the wherewithal to figure out exactly where Kate's Vault was, breach two layers of steel-clad protection (the vault room door and the vault itself), and either disable the burglar alarm or finish the job quickly enough to evade any law enforcement response. But looters are not known for organized behavior. The prospect of all of this happening by chance, without some kind of advance planning or preparation, seems highly improbable, especially during a period of urban unrest.

Under *Aguilar*, there is a triable issue only "if . . . the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion *in accordance with the applicable standard of proof*."

---

[9] Apex objected to Harris's declaration on multiple grounds, but the trial court did not rule on those objections, which leave the objections implicitly overruled. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534.)

*Aguilar*, *supra*, 25 Cal.4th at p. 845, italics added; see e.g., *Leyva, supra,* 20 Cal.App.5th at pp. 1102–1105 [summary judgment properly granted for defense in negligence action involving injuries due to fire, where plaintiffs' evidence narrowing source of ignition to one of two possible causes, only one of which put the defendant at fault, was insufficient to meet plaintiffs' prima facie burden].)  In section 437c procedure, both the movant, initially, and then the non-moving party, once the burden shifts, must meet this prima facie burden.  The burden is not a demanding one—here it is prima facie proof that, if unrebutted, would justify a favorable finding by a preponderance of the evidence—but it is not toothless either.  Phrased in terms of the *Aguilar* burden-shifting framework, we conclude that Falls Lake met its initial burden of production and presented sufficient prima facie proof to support a single occurrence finding in its favor, while Apex not only failed to rebut that showing but on the same factual record failed to bear its initial burden as a cross-movant seeking a multiple occurrence finding.

Apparently, who planned the burglary at Apex's facility and carried it out in the early morning hours of June 1, 2020, will never be known.  The fact that no one has been apprehended or criminally charged seems to have led to speculation and conjecture about what really happened, which is not uncommon with unsolved crimes where very little is known.  But speculation and conjecture cannot drive the insurance coverage analysis here.  What the single "occurrence" versus multiple "occurrences" issue comes down to on this record is which party, Apex or Falls Lake, must bear the risk of uncertainty about what happened, how it happened, and the identity of the perpetrators.  That is why we view the crux of the section 437c analysis as a burden of proof question.  Falls Lake's "coordinated activity" version of events is far from overwhelming, but at least it rests on substantial evidence.  In the face of

25

undisputed circumstances reasonably suggesting that this was a single, targeted raid, Apex failed to carry its own prima facie burden, even when we read the record generously in its favor.

Insisting to the contrary, Apex points to the "completed crime" analysis in the *B.H.D.* case. It argues that "the people who broke into the seven rooms and Distro Vault at 1:45 a.m., and stole more than $1.2 million of Apex's cannabis inventory, committed a crime. Just as clearly, the people who broke into Kate's Vault, at 2:57 a.m., also committed a crime. Even if the same people burgled the seven rooms and Distro Vault and then came back later to break into Kate's Vault (which is clearly not the case from the video/pictorial evidence here), they were separate crimes and, therefore, separate occurrences." We are not persuaded. Whether the individuals involved were the same or different makes no difference; what is important is whether they were working together or separately. As we have explained, on the limited record before us—notably, given the cross-motions on undisputed facts, the parties implicitly recognize that that record will not improve at trial—the only available inference supported by adequate prima facie proof under *Aguilar* is that the burglars were working together.

In relying on the notion of a "completed crime," we also think Apex overreads *B.H.D.* Based on the cases cited in the *B.H.D.* opinion for this point (see *B.H.D.*, *supra*, 46 Cal.App.4th at p. 1142, citing *People v. Stanford* (1940) 16 Cal.2d 247, 251 (*Stanford*) and *People v. Slocum* (1975) 52 Cal.App.3d 867, 889 (*Slocum*)), the passage Apex relies upon appears to reference what is known in the law of theft as the "*Bailey* rule." (See *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*).) Under the *Bailey* rule as it stood when *B.H.D.* was decided in 1992, a defendant could be convicted on separate counts of petty theft carried out "by distinct appropriations of different sums

of money on separate occasions" (*Stanford*, at p. 251, cited by *B.H.D.*, at p. 1142), unless there was enough evidence of a "general intent or overall plan" to send the case to a jury on the theory that offenses should be aggregated into a single offense (*Slocum*, at p. 889, cited by *B.H.D.*, at p. 1142). "The *Bailey* doctrine was developed for the crime of theft to allow, where there is a general plan, the accumulation of receipts from takings, each less than $200, so that the thief may be prosecuted for grand theft as opposed to several petty thefts." (*Slocum*, at p. 889.)[10]

The 1992 version of the *Bailey* rule was broadly analogous to the causation rule laid down in *EOTT*, a case where there were hundreds of separate thefts but a trial was necessary to address the insured's evidence that the thefts were part of a common plan and thus should be treated as a single occurrence. In drawing an analogy to the *Bailey* rule, we do not read *B.H.D.* opinion as having announced a new, "completed crime" mode of analyzing the issue of whether a claimed loss constitutes a single occurrence or multiple occurrences, borrowing from criminal law. The court was simply emphasizing that "[t]his is not a case in which the thief had a general overall plan to steal a particular item or amount, or where he or she took advantage of a position of trust to embezzle an aggregate amount over an extended period." (*B.H.D.*, *supra*, 46 Cal.App.4th at p. 1142.) In short, unlike *EOTT*, there was no evidence of a common plan or conspiracy on that record.

---

[10] Since then, the *Bailey* rule has been given a narrow reading, limited to its particular facts. (See *People v. Whitmer* (2014) 59 Cal.4th 733, 741 ["[A] defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, *even if committed pursuant to a single overarching scheme*. Without deciding whether any particular post-*Bailey* Court of Appeal opinion was incorrect under its facts, we disapprove of any interpretation of *Bailey* that is inconsistent with this conclusion." (Italics added.)].)

This case is the polar opposite. We are not dealing with a series of offenses by a single perpetrator, as in *B.H.D.* and *Lexington*. Falls Lake presented evidence that, in close sequence, a large amount of cannabis inventory was stolen by an unknown group of perpetrators from two different heavily fortified vaults in different locations inside Apex's business premises, in the dead of night. It produced enough evidence to justify a prima facie inference that the perpetrators were working together. Apex, for its part, failed to come forward with anything more than speculation that the breaches of its vaults were somehow attributable to two independent groups of people. Had Apex presented even a modicum of evidence to suggest that different burglary crews broke into the vaults, *operating separately*, there might have been an issue to try, as in *EOTT*. But not even Apex takes the position there must be a trial. It simply tries to declare victory on the record as it stands—asking that we not only reverse but direct entry of judgment in its favor—based on little more than some hand-waving about the absence of a special definition of the term "occurrence" in the Property Coverage. We reject that position, just as the trial court did.

## B. *The Business Income and Extra Expense Issues*

Turning to the trial court's ruling that Apex is not entitled to additional payments under Falls Lake's Lost Business Income Coverage, that issue may be readily dispatched. Here, we conclude that Apex has raised a narrow but triable issue of material fact. We will vacate the judgment in part and remand for further proceedings to resolve that single issue. Falls Lake carried its initial burden of demonstrating that, by paying $673,477 on Apex's Lost Business Income Coverage claim, it fully discharged its contractual obligations to Apex. It did so by proffering a series of emails written by its adjuster, Brenda Wahl, to Apex's team of adjusters, explaining the basis for Falls Lake's rejection of Apex's demand for additional lost business income

28

payment and extra expense reimbursement.  In response, Apex presented a declaration from an accountant on its adjustment team, William Funderburke, who disagreed with Wahl.

This battle of the adjusters framed two issues for decision, both of which are material to the breach element of Apex's breach of contract cause of action.  First, Falls Lake calculated Apex's pre-loss net income by averaging its financial performance over the course of five months.  Apex, on the other hand, proposed a three-month period, which Falls Lake pointed out was distorted by the inclusion of April 2020, Apex's "second best month ever." Second, Apex took the position that, post-loss, it would be "inequitable" for Falls Lake not to reimburse expenses Apex incurred to avoid prolonged business interruption caused by the loss.  In response, Falls Lake argued that equitable considerations do not govern the analysis of benefits payable under the Policy.  Pointing to the language of the Policy, Falls Lake argued that Apex had a duty to mitigate its losses, which meant it was contractually required to incur expense so as not to sustain avoidable further lost business income.

Faced with these diametrically opposed positions, the trial court erred by fully resolving them on this record.  Falls Lake objected in writing to Funderburke's declaration on hearsay and lack-of-foundation grounds, but the court never ruled on those objections.[11]  The court might have correctly chosen between the parties' contending positions had it sustained Falls

---

[11] Falls Lake submitted 15 written objections to Apex's evidence.  The court's order granting Falls Lake's section 437c motion and denying Apex's cross-motion overruled three of Falls Lake's objections, each directed to evidence concerning the single occurrence versus multiple occurrence issue. The court did not address any of the remaining 12 objections, including an objection specifically directed to the Funderburke declaration.

Lake's objections to Funderburke's declaration, leaving Apex with nothing to contest Wahl's unrebutted opinion, and perhaps that is it what it meant to do. The gist of the court's reasons for rejecting Funderburke's view suggests it questioned the evidentiary value of what he had to say, either because he was not appropriately credentialed to offer an opinion or because his opinion lacked foundation. But inadmissibility was not the basis of the trial court's ruling.

A trial court is duty bound to rule on objections attacking evidence material to its disposition of a motion for summary judgment or summary adjudication. (*Vineyard Springs Estates v. Superior Court* (2004) 120 Cal.App.4th 633, 642–643; § 437c, subd. (q).) On appeal, we will not presume from a silent record that a trial court meant to sustain evidentiary objections when it did not expressly so rule. Nor will we undertake the duty to rule on evidentiary objections in the first instance on appeal. Since objections not expressly ruled upon are deemed overruled where they go to material issues of fact (see *Reid v. Google, Inc.*, *supra*, 50 Cal.4th at p. 534), there remains an unresolved factual contest on the record before us, which leaves us no choice but to reverse the judgment in part.

We emphasize, however, that the scope of our remand is narrow. Only one of the two areas of disagreement between Wahl and Funderburke raises a genuine dispute of *fact*. Ultimately, the meaning of the phrases "Net Income of the business before the direct physical loss or damage occurred" and "likely Net Income of the business if no physical loss or damage had occurred"—which are the two key metrics in the formula for "Loss Determination" under Section C.3. of the Lost Business Income Coverage— will present questions of law for the court to decide. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 (*Winet*).) But the conflict in the competing

30

adjusters' opinions must be considered as a preliminary matter, and resolved, before the legal issue of contract meaning can be decided.

That is because "[t]he decision whether to admit parol evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step— interpreting the contract." (*Winet, supra*, 4 Cal.App.4th at p. 1165.) For example, where the court declines to consider parol—which it certainly may do here in the case of adjuster testimony that is inadmissible or simply not credible—leaving only one side's proffered testimony to be admitted, the court may conclude the contract is reasonably susceptible of only one interpretation. (See *George v. Automobile Club of Southern California, supra*, 201 Cal.App.4th at p. 1122.)

While at this stage, on appeal, we cannot predict how this interpretive process will play out on the pre-loss net income issue, we see the extra expense issue differently. Funderburke hypothetically projected a 12-month business shutdown, assuming no effort to reopen the business; calculated the lost income over this period of closure; and then claimed the variable cost to earn that income as "extra expense" under the Lost Business Income Coverage. A premise of this theory was that, in Funderburke's view, the "co-insurance" clause unfairly "penalized" Apex for "earning revenue during the

loss period."[12] The position Wahl took, based purely on a reading of the Policy wording, is that Funderburke's hypothetical was inconsistent with the Policy because Apex had a duty to "resume all or part of your 'operations' as quickly as possible." She anchored her opinion on unambiguous Policy language in the Policy, while Funderburke anchored his in a hypothetical scenario that assumed away Apex's obligation to resume operations as quickly as possible. On this issue, we conclude that Apex failed to advance an interpretation of "extra expense" to which the Policy's language is reasonably susceptible. Thus, as to the matter of "extra expense" reimbursement, there is nothing left to resolve.

## III. DISPOSITION

The judgment is reversed in part. The cause is remanded for further proceedings on the first cause of action to resolve the amount payable on Apex's claim under the Lost Business Income Coverage, and specifically its allegation that Falls Lake calculated the pre-loss net income incorrectly. In all other respects, the judgment is affirmed. Costs on appeal shall be awarded to Falls Lake.

STREETER, J.

WE CONCUR:

BROWN, P. J.
GOLDMAN, J.

---

[12] Apex initially pleaded that Falls Lake improperly calculated the coinsurance penalty, but ultimately abandoned that allegation as a basis for its breach of contract claim.

32

Trial Court:   Superior Court of California, County of Alameda

Trial Judge:   Hon. Tara Desautels

Counsel:       Williams & Gumbiner, Joel P. Gumbiner and Bartlett H.
                   Williams for Plaintiff and Appellant.

                   Hinshaw & Culbertson, Maria S. Quintero for Defendant and
                   Respondent.